06-5267-ag
Natural Res. Def. Council, Inc. v. Fed. Aviation Admin.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2007

(Argued January 23, 2008                                    Decided May 1, 2009)

Docket No. 06-5267-ag

_____

NATURAL RESOURCES DEFENSE COUNCIL, INC.,
DEFENDERS OF WILDLIFE, FRIENDS OF PFN,

*Petitioners,*

– v.–

FEDERAL AVIATION ADMINISTRATION,
LYNNE A. OSMUS, Acting Administrator,* Federal Aviation Administration,

*Respondents,*

PANAMA CITY-BAY COUNTY AIRPORT AND INDUSTRIAL DISTRICT,

*Intervenor.*

_____

Before: SACK, KATZMANN, and RAGGI, *Circuit Judges.*

_____

_____

* Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Acting Administrator
Lynne A. Osmus is automatically substituted for former Administrator Marion C. Blakey.

-1-

Natural Resources Defense Council, Inc., Defenders of Wildlife, and Friends of PFN petition for review of an order of the Federal Aviation Administration approving the relocation of the Panama City-Bay County International Airport to a new site in Bay County, Florida.

DENIED.

---

VICTOR L. HOU, Cleary Gottlieb Steen & Hamilton LLP, New York, New York (Melanie Shepherdson, Benjamin H. Longstreth, Natural Resources Defense Council, Inc., Washington D.C.; Jason Rylander, Defenders of Wildlife, Washington, D.C.; David N. Ellenhorn, Proskauer Rose LLP, New York, New York, *on the brief*), *for Petitioners*.

ELLEN J. DURKEE, Attorney, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C. (Todd Aagaard, Attorney, Matthew McKeown, Acting Assistant Attorney General, Environment & Natural Resources Division, United States Department of Justice; Derek L. Stotts, Office of the Regional Counsel, Federal Aviation Administration, Southern Region, Columbia Park, Georgia; Gail C. Orendorff, Office of the Chief Counsel, Federal Aviation Administration, Washington, D.C., *on the brief*), *for Respondents*.

DONALD A. CARR, Pillsbury Winthrop Shaw Pittman LLP, Washington, D.C. (David J. Cynamon, Kenneth P. Quinn, Jennifer E. Trock, Renee Stone, Pillsbury Winthrop Shaw Pittman LLP, Washington, D.C.; Joseph K. Tannehill, Chairman, Panama City-Bay County Airport and Industrial District, Panama City, Florida, *on the brief*), *for Intervenor*.

Christine E. Lamia, Counsel, Florida Department of Environmental Protection, Tallahassee, Florida, *Amicus Curiae*.

---

REENA RAGGI, *Circuit Judge*:

-2-

The Panama City-Bay County Airport and Industrial District (the "Sponsor"), a state-chartered entity that owns and operates Panama City-Bay County International Airport (the "Panama City Airport"), proposes to close the existing airport at Panama City, Florida, and to construct a new airport in western Bay County (the "West Bay Site"). Pursuant to the Airport and Airway Improvement Act (AAIA), 49 U.S.C. §§ 47101-47131, the Sponsor sought and obtained approval for the construction project from the Federal Aviation Administration ("FAA"). Petitioners Natural Resources Defense Council, Inc., Defenders of Wildlife, and Friends of PFN (collectively, "petitioners") challenge the FAA's decision as a violation of the AAIA and the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4347, and they request that this court enjoin the FAA from implementing its decision. Because the FAA's decision is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), we deny the petition for review and the relief sought therein.

## I.    Background

### A.    Factual Background

#### 1.    The Existing Panama City Airport

The existing Panama City Airport occupies 713 acres on the Florida panhandle. The northwest end of the primary runway abuts the open waters of Goose Bayou, which is part of a system of bays extending inland into Bay County. The remainder of the airport is

-3-

surrounded by roads and commercial and residential development. Any expansion of the existing airport, therefore, would entail re-routing highways, displacing homes, filling in the bay waters of Goose Bayou, or some combination thereof.

Expansion of the existing airport is necessary to comply with the FAA's revised Runway Safety Area standards. The runway safety area serves to reduce the risk of injury to passengers and damage to property "in the event an aircraft undershoots, overshoots, or deviates from a taxiway or runway." 65 Fed. Reg. 38,636, 38,649 (June 21, 2000). By December 31, 2015, all airports receiving federal funding must conform to revised Runway Safety Area standards, see 2006 Transportation Appropriations Act, Pub. L. No. 109-115, tit. I, 119 Stat. 2396, 2401 (2005); 14 C.F.R. § 139.309, by (1) enlarging the safety area to the requisite dimensions, (2) deploying an Engineered Materials Arresting System ("EMAS"),[1] or (3) declaring the runway to be a shorter length, see FAA, Airport Design, Advisory Circular No. 150/5300-13 at 21, 25-26 & app. 14 (Sept. 29, 1989), available at www.faa.gov (follow "Advisory Circulars" hyperlink). These FAA standards provide that the runway safety area should extend 1,000 feet beyond the runway's end. See id. at 26-1 (table 3-3); see also Town of Stratford v. FAA, 285 F.3d 84, 86 (D.C. Cir. 2002) (describing

---

[1] "An EMAS is designed to stop an overrunning aircraft by exerting predictable deceleration forces on its landing gear as the EMAS material crushes." FAA, Engineered Materials Arresting Systems (EMAS) for Aircraft Overruns, Advisory Circular No. 150/5220-22A at 2 (Sept. 30, 2005), available at www.faa.gov (follow "Advisory Circulars" hyperlink).

-4-

methodology for calculating runway safety area). An airport that deploys EMAS, however, may require less than 1,000 feet of runway safety area beyond the runway's end to comply with FAA standards. See FAA, Engineered Materials Arresting Systems (EMAS) for Aircraft Overruns, Advisory Circular No. 150/5220-22A at 1 (Sept. 30, 2005), available at www.faa.gov (follow "Advisory Circulars" hyperlink).

The primary runway at the Panama City Airport is 6,304 feet long, and the secondary crosswind runway is 4,888 feet long. Neither runway complies with the FAA's revised Runway Safety Area standards. To be in compliance, the airport would need to extend the safety area an additional 941 feet beyond the Goose Bayou end of the primary runway. The runway safety area at the southeast end of the primary runway meets an antenna at 445 feet, an airport perimeter road at 678 feet, and State Road 390 at 847 feet. Each of these barriers prevents extension of the safety area to an uninterrupted 1,000 feet beyond the runway's end.

The airport's 6,304-foot primary runway is also too short for larger commercial aircraft. The FAA determined that a 6,800-foot runway would be necessary to accommodate the regional and narrow-body jets that could be expected to serve the airport through 2018. The Sponsor, however, wishes to expand the runway to receive wide-bodied aircraft arriving non-stop from overseas. To serve such larger aircraft, the Sponsor determined that it would need to expand the existing primary runway to 8,400 feet. See Intervenor's Br. at 5-6. Extending the runway either to 6,800 or to 8,400 feet would run into the obstacles discussed above: established homes, businesses, roads, and Goose Bayou.

### 2. The Proposed West Bay Site

The St. Joe Company ("St. Joe"), the largest private landowner in Florida, has agreed to donate approximately 4,000 acres in West Bay County for construction of a new airport, contingent on the Sponsor's agreement to locate the airport within certain boundaries and the FAA's "commitment of funds for the airport's construction." Letter from Peter S. Rummell, CEO, St. Joe, to Donald Crisp, Chairman, Panama City-Bay County Airport and Industrial District, at 1 (Nov. 17, 1999). St. Joe owns most of the land surrounding the proposed site and, thus, would likely benefit from the new airport. See generally Sierra Club v. U.S. Army Corps of Eng'rs, 464 F. Supp. 2d 1171, 1177-78 (M.D. Fla. 2006) (noting St. Joe's regional land holdings and construction plans). To mitigate environmental damage that would be caused by the construction of a new airport, St. Joe has committed to set aside 9,609 of its acres as conservation easements.

### 3. Anticipated Effects of the Proposed Airport on Natural Resources

About half of the 4,037-acre site (approximately 1,929 acres) consists of "jurisdictional wetlands."[2] These wetlands are a potential habitat for several species

---

[2] A "jurisdictional wetland" is a wetland area subject to the jurisdiction of the United States under the Clean Water Act. See Rapanos v. United States, 547 U.S. 715, 763, 765-66 (2006) (Kennedy, J., concurring). The Army Corps of Engineers defines wetlands as "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." 33 C.F.R. § 328.3(b). The parties do not dispute the number of acres of jurisdictional wetlands that would be affected by construction of the proposed airport.

protected by the Endangered Species Act, including the American alligator, the woodstork, the eastern indigo snake, and the flatwoods salamander. The first phase of the new airport construction would fill 596 acres of the wetlands. The FAA estimates that airport development over the next 50 years would have a direct impact on a total of 1,513 acres of the wetlands, with other development potentially affecting all wetlands within the site. These construction impacts and resulting loss of wetlands may adversely affect the eastern indigo snake and flatwoods salamander.

In addition, the proposed airport would be situated in a watershed between two tributaries, Crooked Creek and Burnt Mill Creek, that empty into the West Bay, a body of water containing potential "Essential Fish Habitat." The project would fill in 7,279 feet of streams that eventually join the two larger tributaries. Airport construction would also create nearly 800 acres of impervious surfaces, such as runways and parking lots, that would channel runoff into the Crooked Creek and Burnt Mill Creek watersheds and eventually into West Bay.

B.    Procedural Background

1.    Project History

As with many complex construction projects, plans for the West Bay airport have evolved over a number of years. The Sponsor completed an "Airport Master Plan Update" in 1996, which identified a future need for longer runways and larger runway safety areas to service the Bay County area. The Sponsor initially proposed to extend the existing Panama

-7-

City Airport's primary runway into Goose Bayou, but it abandoned that proposal when the Florida Department of Environmental Protection ("Florida DEP")[3] expressed concern that such a runway extension would (1) adversely affect Class II Surface Water suitable for shellfish propagation or harvesting, (2) fill sovereign submerged lands in violation of Florida law, and (3) destroy protected seagrasses. See Letter from Virginia B. Wetherell, Fla. DEP, to Cherie Trainor, Fla. Dep't of Cmty. Affairs (July 15, 1998); see also Letter from David B. Struhs, Fla. DEP, to Virginia Lane, FAA, at 1 (Oct. 24, 2003) ("The issues and objections expressed in the [1998 letter] have not changed or abated."). Having encountered such opposition, the Sponsor explored other options, including the West Bay Site offered by St. Joe. When the "Feasibility Study for Panama City-Bay County International Airport" commissioned by the Sponsor recommended relocation, the Sponsor, pursuant to the AAIA, sought approval from the FAA to build a new airport at the West Bay Site.

### 2. The FAA's Challenged Approval

In addressing the Sponsor's application to build a new airport at the West Bay Site, the FAA, pursuant to NEPA, prepared a draft environmental impact statement ("EIS") and, after receiving public comment, issued a final EIS ("FEIS"), which assessed, inter alia, the adverse effects of the Sponsor's proposed action and alternatives to the proposal. Relying

---

[3] The Florida DEP is the agency with primary responsibility for administering the state's water resources. See Fla. Stat. §§ 373.026, 403.061. Among other things, it promulgates the state's water quality standards pursuant to the Clean Water Act. See id. § 403.061(31).

-8-

on findings in the FEIS, the agency issued its Record of Decision ("ROD") on September 15, 2006, approving "those federal actions by the [FAA] necessary for the proposed relocation of the Panama City-Bay County International Airport (PFN)." ROD at 4.

The ROD explains the FAA's approval of the Sponsor's application. As discussed in greater detail below, the AAIA does not permit the FAA to approve an airport development project that has a significant adverse effect on natural resources unless there is no possible and prudent alternative to the project and every reasonable effort to mitigate the adverse effect has been taken. See 49 U.S.C. § 47106(c)(1)(B) (discussed infra at Part II.D). While the FAA found that a new airport at the West Bay Site would have a significant adverse effect on natural resources, it nevertheless approved the project because it found that no prudent alternative existed. See ROD at 68-69.

Petitioners timely sought this court's review of the FAA decision pursuant to 49 U.S.C. § 46110.

### 3. Petitioners' Motion to Stay Enforcement of the FAA Order

On November 28, 2007, petitioners filed an emergency motion to stay the FAA's order pending review in this court, which a judge of this court granted. The Sponsor responded with an emergency motion of its own to vacate the stay and to expedite oral argument on the merits. On December 18, 2007, a three-judge motions panel modified the stay to allow limited construction at the West Bay Site. The court heard oral argument on the review petition on January 23, 2008, and vacated the stay entirely on January 25, 2008,

concluding that a balancing of the relevant factors favored the position of the FAA and the Sponsor. We now reach the merits and deny the petition.

## II. **Discussion**

### A. Jurisdiction

We have jurisdiction to review a petition filed by "a person disclosing a substantial interest" in an order issued by the FAA, provided that the "person resides or has its principal place of business" in this circuit. 49 U.S.C. § 46110(a); see also 5 U.S.C. § 702. Although the FAA does not contest jurisdiction, the intervenor Sponsor argues that petitioners fail to satisfy the "substantial interest," or standing, requirement of the statute. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (identifying standing as "an essential and unchanging" predicate to the court's exercise of jurisdiction). We conclude that affidavits submitted by various members of petitioners' organizations, including private pilots who use the existing Panama City Airport and persons who use and enjoy wetlands that will be eliminated by the proposed airport, suffice to demonstrate the requisite substantial interest in the challenged order. See generally Summers v. Earth Island Inst., 129 S. Ct. 1142, 1149 (2009) (noting that harm that "affects the recreational or even the mere esthetic interests" of plaintiff organization's members will "suffice" to establish particularized injury); Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., 528 U.S. 167, 183 (2000) (same).

### B. Standard of Review

We review the FAA's application of law to fact under the Administrative Procedure

-10-

Act, and we will "set aside the agency's decision only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Southeast Queens Concerned Neighbors, Inc. v. FAA, 229 F.3d 387, 394 (2d Cir. 2000) (quoting 5 U.S.C. § 706(2)(A)). Under this deferential standard of review, we cannot substitute our judgment for that of the agency. See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971). Nevertheless, "[o]ur inquiry must be 'searching and careful.'" National Audubon Soc'y v. Hoffman, 132 F.3d 7, 14 (2d Cir. 1997) (quoting Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989)). The record must show that "the agency . . . examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co. ("State Farm"), 463 U.S. 29, 43 (1983); see Yale-New Haven Hosp. v. Leavitt, 470 F.3d 71, 79 (2d Cir. 2006). Moreover, the agency's decision must reveal a "'rational connection between the facts found and the choice made.'" State Farm, 463 U.S. at 43 (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962)); see Fund for Animals v. Kempthorne, 538 F.3d 124, 132 (2d Cir. 2008).

## C. The National Environmental Policy Act Challenge

Petitioners submit that the FAA violated NEPA when it decided to authorize the building of a new airport at the West Bay Site. To facilitate our discussion of this argument, we briefly outline the NEPA provision at issue.

-11-

## 1. NEPA's Requirement for an EIS

NEPA requires a federal agency to prepare an EIS before taking any major action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); see Stewart Park & Reserve Coal., Inc. v. Slater, 352 F.3d 545, 557 (2d Cir. 2003); Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 193 (D.C. Cir. 1991). The purpose of an EIS is to "provide full and fair discussion of significant environmental impacts and [to] inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. Thus, NEPA is "a procedural statute that mandates a process rather than a particular result." Stewart Park & Reserve Coal., Inc. v. Slater, 352 F.3d at 557. The agency's overall EIS-related obligation is to "take a 'hard look' at the environmental consequences before taking a major action." Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 97 (1983). Significantly, "[i]f the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989).

The scope of judicial review of an EIS is "narrow." Sierra Club v. U.S. Army Corps of Eng'rs, 701 F.2d at 1029. "Given the role of the EIS and the narrow scope of permissible judicial review, a court may not rule an EIS inadequate if the agency has made an adequate compilation of relevant information, has analyzed it reasonably, has not ignored pertinent

-12-

data, and has made disclosures to the public." Stewart Park & Reserve Coal.. Inc. v. Slater, 352 F.3d at 557 (internal quotation marks omitted).

### 2. The FAA Did Not Violate NEPA in Authorizing Construction of a New Airport at the West Bay Site

Petitioners assert that the FAA violated NEPA in issuing an FEIS for the proposed airport that failed adequately (a) to evaluate alternatives to the proposed project, (b) to consider the indirect and cumulative effects of the proposed project in its comparison of alternatives, and (c) to disclose scientific evidence indicating that the Sponsor's mitigation efforts will likely not succeed in offsetting the loss of wetlands. Petitioners further fault the FAA for (d) declining to issue a supplemental EIS evaluating the impact of the proposed airport on the endangered ivory-billed woodpecker. We address these objections in turn.

#### a. The FEIS Analysis of Alternatives

Under NEPA, an agency's discussion of "alternatives to the proposed action," 42 U.S.C. § 4332(2)(C)(iii), forms "the heart of the environmental impact statement," 40 C.F.R. § 1502.14. Thus, an agency must "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." Id. § 1502.14(a); see also Citizens Against Burlington. Inc. v. Busey, 938 F.2d at 195 ("[Council on Environmental Quality] regulations oblige agencies to discuss only alternatives that are feasible or . . . reasonable.").

In this case, the FAA did not evaluate in detail any alternative that "did not substantially meet the purpose and need objectives" of the airport project as described in the FEIS. ROD at 19. The FAA also rejected any alternative that would have an adverse impact on Florida Class II Waters, i.e., that would introduce fill materials or pier-based extensions into Goose Bayou. See ROD at 23-24. After these alternatives were eliminated from review, seven remained for detailed consideration. Each involved varying runway and runway safety area expansions with different materials at just two locations: the site of the existing Panama City Airport ("the Existing Site" alternatives) and the West Bay Site. See id. at 24-27.

Petitioners contend that the FAA acted arbitrarily in screening out those alternatives that would affect the adjacent waters of Goose Bayou, including one referred to as "EMAS Scenario 3" that, like "EMAS Scenario 2" (which was considered), would deploy specially engineered materials in the runway safety area to brake aircraft that deviate from the runway. See FEIS at 3-13. EMAS Scenario 3, however, proposed to extend the runway and runway safety area into Goose Bayou on a 4.2-acre pier, thereby affecting Florida Class II waters. See id. at 3-50. It would also extend the runway and runway safety area to the southeast, displacing 22 single-family homes. See id.

We cannot conclude that the FAA abused its discretion in declining to consider alternatives that would affect Goose Bayou. As the FAA noted, Goose Bayou included Florida Class II waters, and the Florida DEP viewed projects affecting such waters as unacceptable, see FEIS at 3-40, a position confirmed by the Florida DEP in its amicus brief

-14-

to this court, see Florida DEP Br. as Amicus Curiae at 5. Thus, the FAA reasonably concluded that projects affecting Goose Bayou did not present workable alternatives because they were unlikely to secure permit approval from the Florida DEP. See Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council Inc., 435 U.S. 519, 551 (1978) (observing that NEPA does not require discussion of alternatives that, "in view of basic changes required in statutes and policies of other agencies," would become available, "if at all, only after protracted debate and litigation" (internal quotation marks omitted)); Friends of Richards-Gebaur Airport v. FAA, 251 F.3d 1178, 1189 (8th Cir. 2001) (holding that FAA was entitled to consider opinion of state government agency); Natural Res. Def. Council, Inc. v. Callaway, 524 F.2d 79, 93 (2d Cir. 1975) (noting that "there is no need to consider alternatives of speculative feasibility or alternatives which could only be implemented after significant changes in governmental policy or legislation"); cf. Islander E. Pipeline Co. v. McCarthy, 525 F.3d 141, 164 (2d Cir. 2008) (noting that "a single state agency effectively vetoe[d] an energy pipeline that ha[d] secured approval from a host of other federal and state agencies").

Even if the Florida DEP had not opposed any airport development affecting Goose Bayou, we would not identify abuse of discretion in the FAA's decision to review EMAS Scenario 2 but not EMAS Scenario 3 as a possible alternative. The two scenarios are similar in that each would extend the existing primary runway to a length of 6,800 feet and would comply with Runway Safety Area standards by deploying EMAS around the lengthened

-15-

runway. Although EMAS Scenario 3 would displace only 22 homes, while EMAS Scenario 2 would displace 49, see FEIS at 3-50, the similarities between the two alternatives, in both advantages and disadvantages, preclude us from concluding that the FAA arbitrarily reviewed the latter alternative but not the former in order to reach a predetermined result. To the contrary, the agency complied with NEPA's procedural requirement that it "briefly discuss the reasons" for eliminating EMAS Scenario 3, 40 C.F.R. § 1502.14, and it reasonably exercised its discretion to carry forward one, but not two, "EMAS Scenario" alternatives for further detailed analysis. See Friends of Ompompanoosuc v. Fed. Energy Regulatory Comm'n, 968 F.2d 1549, 1558 (2d Cir. 1992) ("It is well-settled that under NEPA the range of alternatives that must be discussed is a matter within an agency's discretion." (citing Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. at 551-52)).

Finally, we reject petitioners' contention that the FAA arbitrarily limited the geographic scope of its alternatives analysis to Bay County. Petitioners did not identify alternative sites outside Bay County in their comments on the agency's draft EIS. Moreover, the FAA did in fact consider an alternative occupying part of Gulf County, but reasonably concluded that it was located too far from the "primary market base" to constitute a reasonable option. FEIS at 3-29 to -30.

> b.      FEIS Indirect and Cumulative Impacts Analysis

In determining the scope of an EIS, the agency "shall consider . . . 3 types of impacts":

-16-

direct, indirect, and cumulative.[4] 40 C.F.R. § 1508.25(c). Petitioners contend that the FAA failed to consider the indirect and cumulative impacts of the proposed West Bay airport. Specifically, petitioners argue that the FAA failed to consider (1) the impacts of two major highway construction projects that would provide new routes to the proposed West Bay Site and (2) the environmental impact of three million square feet of commercial and residential development that would be induced by the new airport. Petitioners further allege that the agency arbitrarily limited the geographic scope of its cumulative impacts analysis to Bay County. We reject these contentions as without merit.

----

[4] Indirect impacts or effects (the two words, as used in the regulations, are synonymous, see 40 C.F.R. § 1508.8), are those that

> are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Id. § 1508.8(b). A cumulative impact

> is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

Id. § 1508.7.

## (1) Related Highway Construction

An existing road, County Road 388, traverses Bay County from east to west, passing near the proposed West Bay Site. In its ROD, the FAA forecast a "marginal traffic increase" on existing roads near the proposed site, but did not find any adverse effects attributable to new highway construction. Indeed, the FAA did not identify new highway construction at all except for "turn lanes at CR 388 and the new airport access roadway." ROD at 61; see also FEIS at 5-209 to -210 (listing "reasonably foreseeable major transportation projects in Bay County"). The FAA's modest forecast was soon proved wrong. On March 15, 2007, about six months after the FAA issued its decision, the Northwest Florida Transportation Corridor Authority ("NWFTCA") issued its recommended "corridor master plan," Fla. Stat. § 343.82(3)(a), which the NWFTCA formally adopted on April 5, 2007. The plan describes two new four-lane, limited-access highways, known as the "Freeport-West Bay Connector" and the "West Bay Bypass," respectively, that would provide direct transportation to the proposed airport. See NWFTCA, Master Plan 2007 at 10 (Mar. 2007), http://www.nwftca.com/html/mp_phase2/NFTCA-Master-Plan-2007.pdf; NWFTCA, Master Plan Project Priorities (2007), http://nwftca.com/html/home/NFTCA_Prioritization.pdf.

Petitioners contend that the FAA should have foreseen these developments and accounted for them in the September 15, 2006 ROD because the NWFTCA discussed the West Bay Bypass and the Freeport-West Bay Connector at its board meeting six months earlier, on March 16, 2006. See Pet'rs' Br. at 44 & n.19. The board meeting minutes

-18-

identified "[m]ajor projects," including a "new connector from the Gulf Coast Parkway at US 231 extending to the new airport and on into Walton County." NWFTCA Meeting Minutes ¶ 5(A) (Mar. 16, 2006), available at www.nwftca.com (follow "Board Meetings" hyperlink). Although the speaker referenced a freeway proposal different from the one about which petitioners now complain, the minutes nevertheless suggest that the NWFTCA intended to account for the new airport in its freeway development plans. The minutes do not indicate, however, that any representatives of the FAA were present at the meeting, nor do they indicate any communication with the FAA. In short, the record does not reflect that the FAA had actual notice of the March 16, 2006 freeway proposal.

To the extent the NWFTCA made its proceedings public, the agency might be deemed to have had constructive notice of state highway projects related to the proposed airport. As the Sponsor argues, however, petitioners had the same access to such public information but did not present their concerns about the effects of new highway construction to the FAA during the public comment period, which lasted from May 12, 2006 to July 5, 2006. See Intervenor's Br. at 51. The absence of comments from petitioners regarding the indirect and cumulative impacts of the West Bay Bypass and the Freeport-West Bay Connector, together with the absence of evidence indicating that the agency was actually aware of the highway projects, preclude us from concluding that the FAA's failure to include the impacts of projected highway projects in its ROD was arbitrary or capricious. While an "agency bears the primary responsibility to ensure that it complies with NEPA," Department of Transp. v.

-19-

Pub. Citizen, 541 U.S. 752, 765 (2004), "[p]ersons challenging an agency's compliance with NEPA must 'structure their participation so that it . . . alerts the agency to the [parties'] position and contentions,' in order to allow the agency to give the issue meaningful consideration," id. at 764 (quoting Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. at 553 (alterations in Department of Transportation v. Public Citizen)). For the same reasons, we also reject petitioners' contention that the new highways should have been considered as "[c]onnected actions." 40 C.F.R. § 1508.25(a)(1).

## (2) Induced Growth

Petitioners argue that the FAA erred in failing to consider the environmental impacts of induced growth, thereby precluding a true comparison of alternatives and exhibiting bias in favor of the West Bay Site. In fact, the agency did consider the effects of induced growth as part of its analysis of cumulative impacts. See ROD at 62 ("The effects of induced development are included in the summaries of cumulative impacts . . . ."). It found that, within the designated 4,000-acre West Bay Site, "all 1,936.4 acres of wetlands could be impacted based on the proposed ultimate build-out scenario." ROD at 63; see also FEIS at 5-211. Within the West Bay Sector Plan area, the FAA forecast that approximately 18 percent of the wetlands – about 5,118 acres – could be affected by regional development, while 14,431 acres would remain protected within a conservation area. See ROD at 63; FEIS at 5-211 to -212. Based on these disclosures, we are not persuaded by petitioners' argument that the agency's decision to group induced impacts together with cumulative impacts

-20-

hindered comparison between the Existing Site alternatives and the West Bay Site. Even if the FEIS could have been improved by analyzing induced impacts separately from cumulative impacts, see Letter from Heinz J. Muller, EPA, to Virginia Lane, FAA, at 8 (June 29, 2006) (commenting to that effect), NEPA does not require separate analyses. NEPA requires only that the different types of impacts be considered, which the FAA did.

Petitioners further allege that the agency improperly omitted from its analysis the cumulative impact of the proposed airport on surrounding Walton, Washington, Jackson, Calhoun, and Gulf counties. We disagree. The FAA developed "cumulative impact study areas" based on a consideration of drainage basins, the Sector Plan boundaries, census boundaries, noise contours, drive time contours, and consultation with other agencies. See FEIS at 5-198 to -200. This explanation is sufficient for us to conclude that its delineation of the cumulative impact study areas was not arbitrary or capricious.

Petitioners' argument that the FEIS narrowly focused its analysis on wetlands and failed to consider effects on West Bay is also without merit. The agency did in fact identify the potential impacts of developing the new airport on West Bay waters, noting that stormwater runoff may "result in short and long-term surface water quality impacts." FEIS at 5-108. Although, as other agencies have pointed out, the FAA might have improved its FEIS by including a "complete watershed 'build-out' analysis . . . for the West Bay alternatives," Letter from Gail A. Carmody, Dep't of the Interior, Fish & Wildlife Serv., to Virginia Lane, FAA, at 3 (Jan. 27, 2005), its discussion of runoff impacts on the West Bay

-21-

watershed is not so lacking in detail that it fails to comply with NEPA's procedural requirements. See 40 C.F.R. § 1508.25(c); see also Custer County Action Ass'n v. Garvey, 256 F.3d 1024, 1038 (10th Cir. 2001) (observing that NEPA "requires agencies preparing environmental impact statements to consider and respond to the comments of other agencies, not to agree with them"); Citizens Against Burlington, Inc. v. Busey, 938 F.2d at 201 ("[T]he FAA, not the EPA, bore the ultimate statutory responsibility for actually preparing the environmental impact statement, and under the rule of reason, a lead agency does not have to follow the EPA's comments slavishly – it just has to take them seriously.").

###### c.     Mitigation Disclosures

An EIS must include a discussion of the "[m]eans to mitigate adverse environmental impacts." 40 C.F.R. § 1502.16(h). Petitioners argue that the agency mischaracterized the Sponsor's mitigation plans as bestowing environmental benefits on Bay County, when the planned mitigation would only compensate for the extensive damage the project would cause. They contend that the agency failed to acknowledge scientific evidence that mitigation proposals, such as those put forth by the Sponsor, frequently fail.

To the extent that petitioners seek to engage us in a battle of experts regarding the likelihood of success of the Sponsor's mitigation program, we decline to entertain their arguments, for our role is not to resolve scientific disputes. See Environmental Def. v. U.S. EPA, 369 F.3d 193, 204 (2d Cir. 2004); Stewart Park & Reserve Coal., Inc., v. Slater, 352 F.3d at 557-8. Rather, we examine whether the EIS adequately discussed mitigation efforts

-22-

as required by NEPA. See 40 C.F.R. §§ 1502.14(f), 1502.16(h); see also Robertson v. Methow Valley Citizens Council, 490 U.S. at 352 (noting that NEPA requires only "that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated"). Because the FEIS here at issue includes a thorough discussion of mitigation measures, see, e.g., FEIS app. R, we conclude that it complies with NEPA.

### d.    Supplemental EIS

Eleven days after the FAA issued its ROD, ornithologists from Auburn University announced that they had detected ivory-billed woodpeckers in the wetlands of the Choctawatchee River approximately 20 miles northwest of the proposed West Bay Site. On October 19, 2006, petitioners asked the FAA to reinitiate formal consultation with the United States Fish and Wildlife Service ("USFWS"), the government's expert agency with respect to endangered species, and to prepare a supplemental EIS to consider the effect of the proposed airport development project on the woodpecker. The FAA consequently conducted a "Biological Assessment" pursuant to 16 U.S.C. § 1536(c)(1). On March 2, 2007, the FAA transmitted its Biological Assessment to the USFWS and asked that agency to concur in its conclusion that building the West Bay airport "may affect but [would] not likely [] adversely affect the [ivory-billed woodpecker] if its existence is subsequently confirmed by USFWS." Letter from Jacqueline M. Sweatt-Essick, FAA, to Gail Carmody, USFWS, at 2 (Mar. 2, 2007). On May 8, 2007, the USFWS concurred. Shortly thereafter, on May 10, 2007, the FAA formally notified petitioners that it would not prepare a supplemental EIS. The FAA

-23-

explained that it had shared its Biological Assessment with the USFWS and that both agencies agreed that no further study was needed under the Endangered Species Act or NEPA. Petitioners allege that the FAA's decision not to prepare a supplemental EIS failed to comply with NEPA.

NEPA's implementing regulations provide that agencies "[s]hall prepare supplements to either draft or final environmental impact statements if . . . [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1). In determining whether to prepare a supplemental EIS, the agency has an obligation to take a "hard look" at the new circumstances and information. See Marsh v. Or. Natural Res. Council, 490 U.S. at 373-74. We review the agency's decision not to prepare a supplemental EIS in two parts, asking (1) whether the agency took the "hard look" that the new circumstances required and, if so, (2) whether the agency's decision, based on what it learned, was arbitrary or capricious. See Village of Grand View v. Skinner, 947 F.2d 651, 657 (2d Cir. 1991).

The record demonstrates that the FAA took a hard look at the new information relating to the ivory-billed woodpecker and that its findings were neither arbitrary nor capricious. Having ascertained the potential habitat types for the ivory-billed woodpecker, the FAA examined field and aerial surveys of the 4,000-acre West Bay Site and 75,000-acre West Bay Sector Plan for evidence of such habitats. It found small areas that would serve as potential habitat, but no areas sufficiently large to support the woodpecker within the

-24-

surveyed region. See FAA, Biological Assessment for the Ivory Billed Woodpecker at 11 (Mar. 2007). The agency further concluded, based on its review of the scientific literature, that overhead flight noise was unlikely to have an adverse effect on the ivory-billed woodpecker. See id. at 11-13 & nn.4-10 (citing studies).

Petitioners fault the Biological Assessment as arbitrarily circumscribed in scope because the FAA did not consider the effects of secondary development in areas outside the West Bay Sector Plan. The Sector Plan, however, is itself the product of a "state/local planning process for potential future development in the region." Id. at 9. Thus, it already takes into account many of the secondary effects about which petitioners express concern. To the extent that new roads and dwellings may adversely affect the woodpecker in areas beyond the West Bay Sector Plan, such construction may itself become the object of an appropriate study under the Endangered Species Act, NEPA, or other relevant law.[5] At this time, however, we cannot conclude that the FAA's forecast for future construction prompted by the development of a new airport at the West Bay Site was arbitrary or capricious. See Citizens for Balanced Env't & Transp., Inc. v. Volpe, 650 F.2d 455, 462 (2d Cir. 1981) (rejecting challenge to agency's forecast where "it [was] evident that [the agency] gave careful consideration to the problem toward which the data was directed").

_____

[5] It is far from certain that the ivory-billed woodpecker is not an extinct species. See, e.g., Laura Farrar, Without Proof, an Ivory-Billed Boom Goes Bust, N.Y. Times, Jan. 23, 2008, at A14.

-25-

Having concluded that the FAA complied with NEPA's procedural requirements, we turn to the question of whether the agency's challenged decision complies with the AAIA.

D.    The Airport and Airway Improvement Act Challenge

Under the AAIA, the Secretary of Transportation may approve an application for an airport development project that is

> found to have a significant adverse effect on natural resources, including fish and wildlife, natural, scenic, and recreation assets, water and air quality, or another factor affecting the environment, only after finding that no possible and prudent alternative to the project exists and that every reasonable step has been taken to minimize the adverse effect.

49 U.S.C. § 47106(c)(1)(B) (emphasis added). In this case, the FAA found that building an airport at the West Bay Site "would have significant adverse impacts in the categories of water quality, biotic communities, endangered and threatened species, wetlands, floodplains, and construction impacts." ROD at 68. Nevertheless, because it determined that "none of the build alternatives can be deemed clearly environmentally superior" and "because only the West Bay Site 8,400 foot Alternative meets both the FAA's and the Airport Sponsor's purposes and needs, the FAA [found] that no possible and prudent alternative exists to the Proposed Project." ROD at 68-69.

Petitioners submit that the FAA's finding that there is no prudent alternative is arbitrary and capricious because the FAA improperly (1) considered social impacts in reaching its conclusion that no alternative was environmentally superior to the West Bay Site

and (2) deferred to the Sponsor's preference for an 8,400-foot runway.[6] In short, petitioners

object to the FAA's consideration of non-environmental factors in its analysis of alternatives.

Thus, at issue is the scope of the term "prudent" in § 47106(c)(1)(B).

1.     Defining "Prudent" for Purposes of Assessing Alternatives

a.     FAA Orders Define "Prudent" to Support Consideration of Both
Environmental and Non-Environmental Factors

The AAIA does not define the phrase "prudent alternative," see 49 U.S.C. § 47102

(definitions), nor has the FAA promulgated regulations interpreting it. In 1980, however, the

agency issued Order 5050.4, which served as an instructional manual to guide FAA officials

and included a definition of "prudent alternative" as used in § 47106(c)(1)(B). See FAA

Order 5050.4, Airport Environmental Handbook, 45 Fed. Reg. 56624 (Aug. 25, 1980)

("Order 5050.4"). The interpretive order explained that a "prudent" alternative reflects

"sound judgment" and that an alternative "may not be prudent . . . because of safety, policy,

environmental, social, or economic consequences." Id. at 56652. This definition remained

unchanged when the FAA issued Order 5050.4A in 1985 to amend the Airport

---

[6] The parties do not dispute that alternatives to the proposed West Bay Site were "possible." See FAA Order 5050.4, Airport Environmental Handbook, 45 Fed. Reg. 56,624, 56,652 (Aug. 25, 1980) ("A construction alternative . . . may be feasible if, as a matter of sound engineering principles, it can be built."); FAA Order 5050.4B, National Environmental Policy Act (NEPA) Implementing Instructions for Airport Projects ¶ 1007.e(4)(a) (2006), http://www.faa.gov/airports_airtraffic/airports/resources/publications/orders/environment al_5050_4/ ("[An] alternative may be possible if, as a matter of sound engineering principles, it can be built.").

Environmental Handbook. See FAA Order 5050.4A, Airport Environmental Handbook ¶ 83(b) (Oct. 8, 1985) ("Order 5050.4A").

Subsequently, the agency "substantially update[d] and revise[d] . . . and cancel[led] Order 5050.4A" by implementing Order 5050.4B, which became effective on April 28, 2006. FAA Order 5050.4B, National Environmental Policy Act (NEPA) Implementing Instructions for Airport Projects at Cover Memorandum (2006), http://www.faa.gov/airports_airtraffic/ airports/resources/publications/orders/environmental_5050_4 ("Order 5050.4B"). This order describes a "prudent" alternative as one reflecting "rational[] judgment" and lists the following factors to aid FAA officials "to decide if an alternative is prudent:"

1. Does it meet the project's purpose and need?

2. Does it cause extraordinary safety or operational problems?

3. Are there unique problems or truly unusual factors present with the alternative?

4. Does it cause unacceptable and severe adverse social, economic, or other environmental impacts?

5. Does it cause extraordinary community disruption?

6. Does it cause added construction, maintenance, or operational costs of an extraordinary magnitude? or

7. Does it result in an accumulation of factors that collectively, rather than individually, have adverse impacts that present unique problems or reach extraordinary magnitudes?

Id. ¶ 1007.e(5)(a).

-28-

All iterations of Order 5050.4 thus interpret the term "prudent" to permit consideration of non-environmental factors when assessing alternatives. We proceed to consider what, if any, deference is owed these interpretive orders.[7]

### b. The FAA's Orders Defining "Prudent" to Include Non-Environmental Factors Merit *Skidmore* Deference

The FAA's orders, as agency manuals without the force of law, are not afforded deference under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). Nevertheless, we conclude that the definition of "prudent" found in these orders is entitled to deference pursuant to Skidmore v. Swift & Co., 323 U.S. 134 (1944). See Friends of Richards-Gebaur Airport v. FAA, 251 F.3d at 1186 (according Order 5050.4A Skidmore deference); see also Christensen v. Harris County, 529 U.S. 576, 587 (2000); Boykin v. KeyCorp, 521 F.3d 202, 208 (2d Cir. 2008). Under Skidmore, the weight courts accord an agency interpretation depends on "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." 323 U.S. at 140.

---

[7] There is some record ambiguity as to which interpretive order the FAA relied on in issuing its ultimate approval of the Sponsor's construction of a new airport at the West Bay Site. Although Order 5050.4B was in effect by the time the FAA issued its September 2006 ruling, the ROD indicates that the FEIS was informed by Order 5050.4A, which was in effect during most of the time that statement was being prepared. We need not pursue the matter, however, because both orders interpret "prudent" to provide for consideration of non-environmental factors.

Our analysis of the Skidmore factors in this case leads us to conclude that the FAA's interpretation of the phrase "prudent alternative" has a great deal of persuasive weight. As already noted, the statute does not define the term "prudent," nor does it limit the factors that the agency may consider in assessing whether an alternative is imprudent. The absence of statutory guidance provides the FAA, which is charged with the statute's administration, with flexibility to implement a broad interpretation of the term. See Estate of Landers v. Leavitt, 545 F.3d 98, 105 (2d Cir. 2008) (under Skidmore, "we construe the statute in the first instance," and where the text does not resolve the issue, we give "effect to [the agency's] nonlegislative interpretation to the extent we find it persuasive"). Moreover, the agency's interpretation is longstanding. See id. at 107; see also North Haven Bd. of Educ. v. Bell, 456 U.S. 512, 522 n.12 (1982) ("In construing a statute, this Court normally accords great deference to the interpretation, particularly when it is longstanding, of the agency charged with the statute's administration."). The FAA first defined "prudent" in 1980, modifying that definition only once, in 2006. See Order 5050.4B Cover Memorandum (observing that Order 5050.4A has served FAA "well for over 20 years"). Throughout, the agency has provided for a number of non-environmental factors to be considered in determining whether an alternative is prudent. Finally, the agency's definition is "the product of an interpretation that is relatively formal within the universe of informal interpretations." Estate of Landers v. Leavitt, 545 F.3d at 110. Specifically, the FAA's interpretation of "prudent" for purposes of considering alternatives is set forth in a manual rather than, for example, a non-

precedential letter ruling. Moreover, the interpretation is generally applicable and not an ad hoc position. See Chauffeur's Training Sch., Inc. v. Spellings, 478 F.3d 117, 129 (2d Cir. 2007) (observing that agency interpretation is entitled to greater Skidmore deference when "the interpretation in question is not merely ad hoc but . . . is applicable to all cases"). These circumstances all support Skidmore deference.

2. Petitioners' Argument that the FAA's Interpretation Is Contrary to Law Is Without Merit

On appeal, petitioners do not dispute that the FAA's interpretative orders define "prudent" to include non-environmental factors. Indeed, their opening brief makes no reference to these orders, and it is only in their reply brief that petitioners acknowledge the orders, which they note were "brought to our attention by Intervenor's brief." Pet'rs' Reply Br. at 8. In so doing, they assert that the orders support their contention that only the FAA's purpose and need, not those of the Sponsor, are relevant to assessing prudent alternatives. We address that argument infra in Part II.D.3.b of this opinion. We first address petitioners' arguments that the agency's definition of the term "prudent" is not a valid interpretation of the AAIA and contravenes the Supreme Court's holding in Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971).

a. The AAIA Does Not Preclude Consideration of Non-Environmental Factors in Assessing Prudent Alternatives

Petitioners argue that the "AAIA's unambiguous terms and structure both demonstrate that when analyzing section 47106(c)(1)(B) the Secretary is to consider effects to the natural

-31-

rather than the social environment." Pet'rs' Br. at 30. We disagree. Petitioners' argument conflates two separate inquiries mandated by § 47106(c)(1)(B): first, whether the proposed project would "have a significant adverse effect on natural resources," 49 U.S.C. § 47106(c)(1)(B); and second, where the answer is yes, whether a "possible and prudent alternative to the project exists," id.

It is the first inquiry that must focus exclusively on natural resources. Here, the FAA found that the proposed construction of a new airport at the West Bay Site would have a significant adverse effect on such resources. ROD at 68. Having made that determination, the FAA was required to conduct a second inquiry: whether a possible and prudent alternative to the proposed project exists. As discussed above, the statutory text does not direct the agency to consider effects only on natural resources in conducting this inquiry. Thus, we identify no textual obstacle to according Skidmore deference to the broader definition of "prudent" reflected in FAA Orders 5050.4A and 5050.4B.

      b.      The Agency's Definition of "Prudent" to Include Non-Environmental Factors Is Not Precluded by the Supreme Court's Decision in *Overton Park*

Petitioners argue that Congress intended the word "prudent" in § 47106(c)(1)(B) to be construed in light of the Supreme Court's decision in Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, which interpreted that term as used in the Department of Transportation Act ("DOT Act") and the Federal-Aid Highway Act. Those provisions are similar to § 47106(c)(1)(B), providing that the Secretary of Transportation shall not approve

any program or project that requires the use of any public parkland unless there is no "feasible and prudent alternative." 23 U.S.C. § 138(a)(1); 49 U.S.C. § 303(c)(1) ("prudent and feasible alternative"); see also 401 U.S. at 411. In Overton Park, the Supreme Court held that an alternative was prudent "unless there were truly unusual factors present in a particular case or the cost or community disruption resulting from alternative routes reached extraordinary magnitudes." 401 U.S. at 413.

We conclude that Overton Park's interpretation of "prudent" as used in the DOT Act and the Federal-Aid Highway Act does not constrain the FAA in its analysis of prudent alternatives under the AAIA. The DOT Act and the Federal-Aid Highway Act restrict the use of specifically designated areas: publicly owned land of a public park, recreation area, wildlife refuge, or land of an historic site. See 49 U.S.C. § 303(c); 23 U.S.C. § 138(a). Precisely because parkland is publicly owned, "there will always be a smaller outlay required from the public purse when parkland is used [for a highway] since the public already owns the land and there will be no need to pay for right-of-way." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. at 412 (footnote omitted). Moreover, "since people do not live or work in parks, if a highway is built on parkland no one will have to leave his home or give up his business." Id. In sum, in most cases of highway construction, considerations of non-environmental factors such as "cost, directness of route, and community disruption will indicate that parkland should be used for highway construction whenever possible." Id. at 411-12. Thus, the Supreme Court concluded that if the DOT Act and the Federal-Aid

-33-

Highway Act were "to have any meaning," the costs or community disruption to a non-parkland alternative must reach "extraordinary magnitudes." Id. at 413.

The AAIA does not implicate the same considerations identified in Overton Park. Section 47106(c)(1)(B) restricts the use of any land with natural resources, whether publicly or privately owned. See Citizens Against Burlington, Inc. v. Busey, 938 F.2d at 205 (noting distinction). Thus, it is not always the case, as it was in Overton Park, that the proposed project would pose less cost or community disruption than any alternatives such that, when taking into account all the various factors, the proposed project will always be a more attractive option than the alternatives.

Moreover, § 47106(c)(1)(B) deals with restrictions on airport development projects, while the statutes that were at issue in Overton Park dealt with restrictions on highway projects. The factors involved in locating an appropriate site for an airport are many and complex. As evidenced in this case, significant safety considerations are at issue in the construction or expansion of an airport. Notably, runways must be designed and built according to certain specifications to avoid injury to persons or property "in the event an aircraft undershoots, overshoots, or deviates from a taxiway or runway." 65 Fed. Reg. 38,636, 38,649. It can be difficult to find a large enough plot of land that is also in close proximity to urban centers that the airport would service.

Because of the different considerations involved in airport projects, we decline to conclude that Overton Park precludes the FAA's adoption of a broader definition of

"prudent" for purposes of the AAIA. We proceed to consider whether the FAA's decision to approve the Sponsor's application was arbitrary or capricious using the agency's definition in its interpretive orders.

3. The FAA's Finding as to the Lack of Prudent Alternatives Was Not Arbitrary and Capricious

The FAA concluded that there was no prudent alternative to the proposed project at the West Bay Site because "none of the build alternatives can be deemed clearly environmentally superior" and "because only the West Bay Site 8,400 foot Alternative meets both the FAA's and the Airport Sponsor's purposes and needs." ROD at 68-69. Petitioners challenge both findings as arbitrary and capricious. We address each objection in turn.

a. The FAA Did Not Act Arbitrarily or Capriciously in Considering Social Impacts as Well as Impacts to Natural Resources in Assessing Prudent Alternatives

Petitioners submit that the FAA erred in concluding that there were no "environmentally superior" alternatives to the Sponsor's proposal because that determination improperly equated social impacts with impacts to natural resources. ROD at 68. They contend that, as between the Existing Site alternatives and the Sponsor's West Bay Site, the former "would cause far less harm to natural resources." Pet'rs' Br. at 28.

Even granting petitioners' argument that it may have been inaccurate for the FAA to label "impacts to people and human communities" as "environmental," ROD at 35, that flaw does not render the FAA's ultimate approval decision arbitrary or capricious. For reasons already discussed, the agency was permitted to consider social impacts in assessing whether

-35-

alternatives were prudent. See supra at **[33-34]**. Furthermore, neither § 47106(c)(1)(B) nor the agency's interpretive orders require the FAA to identify an option as prudent because it has the lesser adverse effect on natural resources when, as in this case, it has a significant adverse effect on human communities. The interpretive orders contemplate that the prudence of an alternative will be assessed by reference to a variety of factors. See Order 5050.4A ("The environmental documentation must show that no feasible and prudent alternative exists when all factors . . . are considered." (emphasis added)); Order 5050.4B (instructing agency officials to consider whether "an accumulation of factors that collectively, rather than individually, have adverse impacts that present unique problems or reach extraordinary magnitudes").

In any event, the agency's decision to approve the Sponsor's application ultimately did not rest on the social or environmental impacts posed by construction of a new airport at the West Bay Site. The agency determined, well within reason, that the "dissimilar nature of the impacts associated with the Existing Site and the West Bay Site prevents a meaningful direct comparison of the impacts of the alternatives"; thus, it found that the distinct disadvantages posed by both locations were in equipoise. ROD at 35 (observing that "[a]t the Existing Site, the primary considerations relate to impacts to people and human communities," including displacement of certain persons from their homes, "whereas considerations at the West Bay Site relate primarily to natural communities and values"); see also id. Tables 4 & 5 (providing side-by-side comparison of the alternatives' social and

-36-

environmental impacts). That conclusion prompted the FAA to look at the purposes and needs of the proposed project and to conclude that, of all the possibilities under consideration, "only the West Bay Site 8,400 foot Alternative meets both the FAA's and the Airport Sponsor's purposes and needs." ROD at 68-69.

b. The FAA Did Not Act Arbitrarily or Capriciously in Evaluating the Project's Purpose and Need

In light of the adverse impacts to natural resources posed by the West Bay Site and the adverse social impacts posed by the Existing Site alternatives, the FAA decided to accord "weight to the ability of the West Bay Site alternatives to provide future flexibility for expansion, current and future land use compatibility, decreased complexity in the airspace environment, and satisfaction of the Airport Sponsor's goals and objectives." ROD at 35. Petitioners assert that the FAA's "deference to the Sponsor's preferences violates the AAIA" and cannot be used to rule out alternatives. Pet'rs' Br. at 33, 35. The argument is unconvincing.

Although Order 5050.4A does not specifically list "purpose and need" as a factor in the analysis of prudent alternatives – as Order 5050.4B clearly does – it does instruct the FAA to consider the "policy" consequences of a proposal. In the AAIA, Congress declared that it is the policy of the United States that airport development projects be carried out "to foster competition." 49 U.S.C. § 47101(d). Consistent with this national policy, the FAA appropriately considered the Sponsor's goal, specifically, that in undertaking construction necessary to comply with FAA Runway Safety Area standards, the Sponsor would create an

-37-

airport that could also attract new air carrier service domestically and internationally. To achieve its objective, the Sponsor identified a need for an 8,400-foot runway to accommodate wide-body aircraft capable of nonstop, international travel. See ROD at 18. The FAA did not act arbitrarily or capriciously in considering this objective in identifying prudent alternatives because it was consistent with the federal purpose of fostering competition.

This is not to suggest that a Sponsor's objectives can, by themselves, necessarily render other alternatives imprudent. In determining the existence of prudent alternatives, a reviewing agency should appropriately "exercise a degree of skepticism in dealing with self-serving statements from a prime beneficiary" of a proposed project. Simmons v. U.S. Army Corps of Eng'rs, 120 F.3d 664, 669 (7th Cir. 1997) (internal quotation marks omitted). But skepticism does not automatically render private objectives irrelevant. The AAIA entrusts the agency with the responsibility for assessing prudence by deciding for itself the appropriate weight to accord myriad relevant factors. We identify no abdication of that duty in this case.

Indeed, the detailed ROD indicates that the FAA's challenged decision was largely informed by the agency's determination that none of the alternatives to the proposed new airport met its own purposes and needs. In reaching this conclusion, the FAA focused primarily on its own statutory mandate to serve the United States' policy that airports be designed and built to enhance safety and security, to minimize noise disturbances to surrounding communities, and to maintain the flexibility to accommodate changes in demand

-38-

and new aircraft types. See 49 U.S.C. § 47101(a). The FAA identified specific needs relevant to these statutory purposes: the need to ensure that the existing Panama City Airport complied with FAA runway safety requirements, the need to avoid airspace conflicts involving the existing airport and the Tyndall Air Force Base, the need to accommodate larger aircraft and greater service demand in the Bay County area, and the need to minimize noise and residential displacement in the event of any airport expansion. See ROD at 17-18. Upon consideration of these needs, the agency determined that, without considerable expansion of its runway safety areas, the existing airport could not comply with FAA requirements, see id. at 37; FEIS 2-7 to -9, thereby seriously undermining the agency's highest policy priority: public safety, see 49 U.S.C. § 47101(a)(1) (stating that "safe operation of the airport and airway system is the highest aviation priority"). The FAA further found that the Existing Site alternatives failed to meet the FAA's goal of minimizing airspace conflicts with nearby Tyndall Air Force Base. See ROD at 35. It also found that the Existing Site alternatives would not be able to expand to meet anticipated growth in public demand for air services without exceptional difficulty. See ROD at 34-35.

Thus, the FAA concluded that the Existing Site alternatives were not prudent because they were unable to meet both the agency's purposes and needs and those of the Sponsor. In light of these findings, which are supported by the record, we cannot conclude that the approval of the West Bay Site was arbitrary or capricious.

## III.  Conclusion

To summarize, we conclude as follows:

1.  The FAA complied with the procedural requirements of NEPA in evaluating the Sponsor's proposal to build a new airport at the West Bay Site.

2.  The FAA's determination that no prudent alternatives to the proposed West Bay Site existed was not arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.

Accordingly, we reject petitioners' challenge to the FAA order permitting the Sponsor to engage in the proposed construction.  The petition for review of that order is DENIED.