TOWN OF STRATFORD,
CONNECTICUT,
Petitioner,

v.

FEDERAL AVIATION ADMINISTRA-
TION and Jane F. Garvey, Admin-
istrator, Respondents.

No. 99–1507.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 6, 2000.

Decided April 9, 2002.

William A. Butler argued the cause and filed the briefs for petitioner.

Robert H. Oakley, Attorney, United States Department of Justice, argued the cause for respondents. With him on the brief were Lois J. Schiffer, Assistant Attorney General, and Ellen Durkee, Attorney.

Before: ROGERS and GARLAND, Circuit Judges, and SILBERMAN, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge SILBERMAN.

SILBERMAN, Senior Circuit Judge:

The Town of Stratford petitions for review of the Federal Aviation Administration's Decision concerning the Bridgeport–Sikorsky Memorial Airport and disposal of land from the Stratford Army Engine Plant. We conclude that Stratford lacks prudential standing to pursue its claims that the FAA's Environmental Impact Statement (EIS) was inadequate under the National Environmental Policy Act[1] and that its remaining claims are without merit. Stratford's petition is therefore denied.

## I.

The Bridgeport–Sikorsky Memorial Airport (BDR) belongs to Bridgeport, Connecticut, but actually sits in the neighboring town of Stratford. The airport is bounded by wetlands and the Stewart B. McKinney National Wildlife Refuge, Great Meadows Marsh to the southwest, by the Lordship township to the south and east, by Connecticut State Highway 113 (Stratford's "Main Street") to the northeast, and by the residential township to the northwest. Across Main Street from the airport is the Stratford Army Engine Plant (SAEP), which has closed. Stratford and Bridgeport have had a number of disputes over the airport, some of which focused on the property tax revenues Stratford loses because of the airport's municipal status. In 1978, the disputes resulted in a court-approved settlement that required Bridgeport to obtain Stratford's permission for "the acquisition of land for the purposes of extension of the airport runways, and ... for the extension of any of the airport runways." The airport has two runways

currently in use: Runway 6–24, which is the primary one, and Runway 11–29.[2]

Bridgeport has filed an "Airport Master Plan" with the FAA that calls for the renovation of the two runways, beginning with Runway 6–24, and the addition of several safety enhancements. Bridgeport asserts that the concrete on Runway 6–24 needs replacement to make the airport safer. Replacing the concrete is a "reconstruction ... of a runway," which requires the city to construct "a [runway] safety area that conforms to the dimensions acceptable to the [FAA]" at the time of reconstruction. 14 C.F.R. 139.309(a)(2).

The length of a runway safety area is determined by an airport's "design classification," a description of the largest class of aircraft that uses the runway for 500 or more operations per year. The category is determined by the design aircraft's landing-approach speed and the group by the design aircraft's wingspan. The recommended safety area for a C–II airport is 1000 feet long by 500 feet wide at either end of the runway. (By contrast, a B–II airport has a recommended safety area of only 600 feet by 300 feet.) BDR is currently a C–II airport, the safety areas for which would require expansion of the airport (although not the runways themselves) into the space currently occupied by Main Street and beyond.

After receiving Bridgeport's Airport Plan, the FAA prepared an EIS evaluating various possible safety measures at the airport. The EIS' Statement of Purpose and Need outlined its general objective of increasing safety for general/corporate and commercial aviation services. The EIS

---

1. 42 U.S.C. §§ 4321–4370e. Stratford also invokes two sets of NEPA implementing regulations—those of the Council on Environmental Quality, 40 C.F.R. § 1500–17, and the Airport Environmental Handbook, FAA Order 5050.4A for implementation of NEPA.

2. Runways are named for their headings, to the nearest 10°. Runway 6–24 runs 60° and 240°, depending on which way a plane comes in. Runway 11–29 runs 110° and 290°.

considered three groups of alternatives. The Preferred Alternative shifted runway 6–24 to the northeast, provided for a new taxiway area (which encroaches on the SAEP), provided for safety areas of 1000 feet on either end of the runway, placed a light system on a catwalk through wetlands, required the rerouting of Main Street through the SAEP, recommended annexation of four SAEP acres and placing "avigation restrictions covering height and electromagnetic, smoke, and light emissions," on an additional five,[3] and created wetland impacts which would require mitigation. Importantly, the Preferred Alternative did not contemplate extending the runway itself.

The FAA then issued its Decision, which followed the EIS, approving in most part the Airport Master Plan, including expanded safety areas. Stratford petitions for review of that Decision on three grounds: first, that the FAA's Environmental Impact Statement was inadequate under NEPA, the CEQ regulations and Airport Handbook; second, the FAA violated the Airports and Airways Improvement Act;[4] and third, subsequent events require preparation of a Supplemental EIS.

While the FAA was considering the Airport Master Plan, the SAEP was scheduled for closure under the Defense Base Closure and Realignment Act of 1990, Pub. L. No. 101–510 (1990), and the recommendations of the 1995 Defense Base Closure and Realignment Commission (collectively "BRAC"), and the Army was considering how to dispose of that land. BRAC sets forth the federal policy preference of returning the land of closing bases to the host community–in this case, Stratford.

As part of the base closure process, the Army also prepared an EIS. Its Preferred Alternative was the "Encumbered Disposal Alternative," which would transfer the SAEP land to Stratford subject to restrictions preventing redevelopment of the property from interfering with BDR and from producing excessive wetland or other environmental impacts. In its EIS, the Army discussed the economic effects of the proposed safety enhancements as well as the potential conflict between protecting BDR's operations and Stratford's redevelopment plans. The Army ultimately concluded that its Preferred Alternative would not be expected to cause "any serious disruption or impairment to redevelopment of the site," in part because the encumbered parcel was at the fringe of the SAEP in the area most prone to airport noise, which made it the least desirable parcel for development. As for moving Main Street, the Army concluded that it would entail minor long term adverse impacts but would also produce minor beneficial effects on air quality. The Army issued two decisions concerning disposal of the disputed land, one in January 2001, the other in November 2001. The FAA now purports to rely on the Army's consideration of certain factors.

 At oral argument, we sua sponte raised the question of whether Stratford had been injured so that standing existed, and whether the case was ripe for decision. We had two primary concerns: first, the Army had not yet issued its decision concerning disposal of the SAEP land. Second, Stratford claimed that it exercised veto power over a potential movement of Main Street, which called into question the

---

**3.** These avigation restrictions create an imaginary geometric plane above which structures cannot be built for fear of interfering with aircraft in flight. This plane begins at the edge of the airport and moves gradually upward, since the farther from the airport the less the chance a low-flying plane would collide with a building.

**4.** 49 U.S.C. §§ 47101 *et seq.*

likelihood of the FAA's Preferred Alternative ever being implemented. After the Army issued its decision, the parties submitted supplemental briefing concerning standing and ripeness. The FAA told us "that the Administrator ... has concluded that the FAA will seek to condemn the road so that the airport enhancements needed for safety reasons can be constructed at BDR." Stratford, therefore, will no longer be able to exercise veto power over a movement of Main Street. With the issuance of the Army's decision and FAA counsel's representation as to condemnation, Stratford's petition is ripe for review.[5] We are also satisfied that Stratford meets the requirements for Article III standing because its developmental prospects are clearly impaired.

## II.

■ Although we conclude that Stratford has suffered an injury-in-fact, there still remains the question whether it has prudential standing to raise its NEPA, CEQ, and Airport Handbook claims. Stratford does assert that relocating Main Street will add almost a minute of travel time to automobile users of Main Street—including its emergency personnel—but the Town does not claim that it (or anyone else) will suffer any environmental injury because of that delay. Nor does Stratford claim that its other injury-in-fact—that but for the FAA's decision nine additional acres would be available for development—has any negative environmental consequences.

Since NEPA does not create a private right of action, petitioner relies on the APA, which limits prudential standing to an "aggrieved party" within the meaning of the substantive statute upon which the claim is based. 5 U.S.C. § 702; *see also Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). But we have squarely held that a NEPA claim may not be raised by a party with no claimed or apparent environmental interest. *See, e.g., ANR Pipeline Co. v. FERC,* 205 F.3d 403, 408 (D.C.Cir.2000). It cannot be used as a handy stick by a party with no interest in protecting against an environmental injury to attack a defendant.

To be sure, the Supreme Court in *Bennett v. Spear,* 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997), in reversing the Ninth Circuit, not surprisingly recognized that the Endangered Species Act did allow a petitioner with only economic interests to challenge an action of the Fish and Wildlife Service. That was because the specific section of the statute upon which the petitioners (irrigation districts and ranchers) relied was drafted at least in part to avoid needless economic dislocation. The Court emphasized that a court must examine—not just the general aims of a statute—but the specific provision in question to determine whether a plaintiff or petitioner has prudential standing.

■ Although petitioner in our case does not even suggest a real basis for prudential standing, the government points us to an Eighth Circuit case, *Friends of the Boundary Waters Wilderness v. Dombeck,* 164 F.3d 1115 (8th Cir. 1999), reasoning that a CEQ regulation implementing NEPA can confer prudential standing on a petitioner asserting an economic injury even if the statute does not.

---

**5.** Although the City of Bridgeport must still obtain certain permits in order for the airport redevelopment to progress, the Decision itself is ripe for review even if the sponsor has yet to get all of the permits required for construction. *See City of Bridgeton v. FAA,* 212 F.3d 448, 463 n. 6 (8th Cir.2000).

The regulation provides that "human environment" as used in the statute "shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment." 40 C.F.R. § 1508.14. And the regulation further states that:

This means that economic and social effects are not intended by themselves to require preparation of an environmental impact statement. When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment.

*Id.* The Eighth Circuit read the *Bennett* reference to "the particular provision of law upon which the plaintiff relies" to include a provision of an implementing regulation—even though the Supreme Court quite clearly in *Bennett* was referring to a particular section of a statute.

We do not see how any agency regulation implementing a statute could extend prudential standing beyond the class of persons Congress intends, but, in any event, we do not read the CEQ regulation as purporting to extend prudential standing. It does indicate that when economic and social effects are interrelated with natural and physical environmental effects the EIS will "discuss" all of these effects, but it does not require government agencies to take economic effects into account. Moreover, the Town of Stratford is not even claiming, as did the ranchers in *Bennett,*

that the government's actions calculated to protect the environment directly harm its economic interests, nor does it claim that those interests are in any other manner interrelated with the environmental effects. Instead, petitioner's assertion that the FAA's EIS is defective because not sufficiently sensitive to environmental concerns is truly unrelated—or at most "marginally related"—to the injury it asserts, except insofar as it argues that the entire Airport Plan should not go forward. *Clarke v. Securities Industry Ass'n,* 479 U.S. 388, 399, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987). In other words, petitioner has not connected its claimed economic injury to any environmental effects caused by the allegedly defective EIS. Instead, its EIS claim is simply the "handy stick" with which to attack the FAA.[6]

### III.

In its remaining set of challenges, Stratford argues that the FAA failed to comply with the Airports & Airways Improvement Act (AAIA) in various ways. It is claimed that the Decision does not comply with 49 U.S.C. § 47106(a)(1), which provides that a grant may be given to finance airport projects only if the Secretary is satisfied that "the project is consistent with plans (existing at the time the project is approved) of public agencies authorized by the State in which the airport is located to plan for the development of the area surrounding the airport." The FAA responds that it is not clear that Stratford is a "public agency" with plan-

---

6. Stratford brings several other claims under an additional CEQ regulation and several provisions of the FAA's Airport Environmental Handbook, each of which implement NEPA. These include the Town's claims that the FAA's decision is arbitrary because it fails to consider cumulative effects, alternative safety measures, and potential conflicts with federal, state, and local land use policies, among them BRAC and the settlement between Stratford and Bridgeport. Since Stratford does not have prudential standing under 40 C.F.R. 1508.14, it follows that it does not have prudential standing under the other CEQ regulation or Airport Handbook provisions either. Nor does Stratford have prudential standing to request preparation of a Supplemental EIS based on intervening events.

ning authority as that term is used in the statute. And the record indicates that BDR has yet to apply for federal funding, making it unlikely that this provision has been triggered. In any event, Stratford has not shown that the Decision is not "reasonably consistent" with its planned redevelopment. *See Suburban O'Hare Comm'n v. Dole*, 787 F.2d 186 (7th Cir.), *cert. denied*, 479 U.S. 847, 107 S.Ct. 169, 93 L.Ed.2d 106 (1986). According to "Stratford Visions: 2001—The Town's Plan of Development," Stratford seeks to "[e]ncourage land use management strategies which recognize the airport as a legitimate use at its current location [and d]iscourage placement of structures and objects in the vicinity of the airport, which would create hazards to air traffic and/or create risks to property and life." Because the FAA conditioned the proposed safety enhancement on Bridgeport obtaining the necessary federal, state, and local permits, the permitting process will ensure that the Airport Plan is consistent with local planning.

■■■ Stratford also asserts that the FAA failed to comply with 49 U.S.C. § 47106(b), which provides that before the FAA approves a grant for airport development, the Secretary of Transportation must be satisfied that "the sponsor, a public agency, or the Government holds good title to the areas of the airport used or intended to be used ... or that good title will be acquired." As noted above, the record does not indicate that Bridgeport has applied for funding yet. Moreover, counsel for FAA has represented to us that the agency will exercise its condemnation power to eliminate any issues over title to the land under Main Street. Stratford's claim that the FAA failed to comply with 49 U.S.C. § 47106(b)(2), which requires that the Secretary be satisfied that the "interests of the community in or near which the project may be located have

been given fair consideration" is also without merit. The record reflects Stratford's self-described "extensive" involvement in the decisionmaking process.

■■■ Stratford's remaining two AAIA claims are based on 49 U.S.C. § 47106(c), which applies to "an airport development project involving the location of an airport or runway or a major runway extension." Under that section, the Secretary must obtain a certification from the Governor of Connecticut that the project will meet applicable air and water quality standards, and if the Plan is found to have a significant adverse effect on natural resources, the Secretary must also determine that "no possible and prudent alternative to the project exists and that every reasonable step has been taken to minimize the adverse effect." The government maintains that the section only applies to the location of a new runway, or a major expansion of an existing runway, and the Airport Plan does not contemplate either.

Stratford argues that the shifting of the runway 700 feet to the northeast, while maintaining the same compass headings, is a "location of [a] runway." We are not persuaded by Stratford's argument that the term "location" must include any relocation—no matter how minor. It seems apparent to us that the statutory term "location" is ambiguous. That being so, the only question for us is whether, under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the FAA's interpretation is based on a reasonable construction, and we think that it is.

■■■ In the alternative, the Town argues that the renovation must be a "major" runway extension. The FAA has keyed the definition of "major" to noise impacts, defining a major runway expansion as one that will permit the accommodation of aircraft that would result in an increase in

noise of three decibels, an interpretation the Seventh Circuit concluded was reasonable in *Suburban O'Hare Commission,* 787 F.2d at 199–200. As the Secretary points out, Stratford's suggestion, that even if the renovation was not a "major" runway extension it was a runway location, would lead to the odd result that a runway extension, no matter what length, would not trigger AAIA's requirement unless it resulted in a significant increase in noise, yet any partial relocation, no matter how minor, would trigger section (c). But both new runways and major runway extensions potentially allow more aircraft and expo-

sure of the surrounding areas to additional noise. Because the Airport Plan does not contemplate either a "location of a runway" or a "major runway extension," section (c) does not apply, and Stratford's argument founders on a threshold reef.

Accordingly, Stratford's petition for review is denied.