# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 14, 2010   Decided December 28, 2010

No. 09-1064

CITY OF DANIA BEACH, A POLITICAL SUBDIVISION OF THE
STATE OF FLORIDA, ET AL.
PETITIONERS

v.

FEDERAL AVIATION ADMINISTRATION,
RESPONDENT

BROWARD COUNTY, FLORIDA,
INTERVENOR

———

Consolidated with 09-1067

———

On Petitions for Review of an Order
of the Federal Aviation Administration

———

*Neil McAliley* argued the cause and filed the briefs for petitioners.

*Robert P. Stockman,* Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were *Andrew C. Mergen* and *M. Alice Thurston,* Attorneys. *John C. Cruden*, Assistant Attorney General, and *Ellen J. Durkee*, Attorney, entered appearances.

*Michael G. Schneiderman* argued the cause for intervenor. With him on the brief were *Andrew J. Meyers* and *James D. Rowlee.*

Before: GINSBURG and ROGERS, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

Opinion concurring in part, dissenting in part, and concurring in the judgment filed by *Circuit Judge* ROGERS.

WILLIAMS, *Senior Circuit Judge*: Fort Lauderdale-Hollywood International Airport no longer has the capacity to meet existing demand without substantial delays. Congestion and delay, indeed, are projected to increase. The parties dispute what to do about it.

The airport now has three runways. Two are widely spaced and run parallel in the east/west direction on either side of the airport terminal—the 9,000-foot by 150-foot "main" runway and a shorter south runway; the third runs diagonally from northwest to southeast. Only the main runway is long and wide enough to accommodate larger aircraft. The airport's owner, Broward County, seeks to extend the south runway to 8,600 feet by 150 feet and to close the diagonal runway. It applied to the Federal Aviation Administration for federal funding and for the many FAA approvals needed to begin construction pursuant to the Airport and Airway Improvement Act ("AAIA"), 49 U.S.C. §§ 47101-47131, and related statutes. After considering several possible alternatives to the county's proposal and conducting a lengthy environmental review process, the FAA issued a Record of Decision that with minor modifications

approved the county's proposal, dubbed Alternative B1b. 74 Fed. Reg. 978 (Jan. 9, 2009) (the "Decision").

The cities of Dania Beach and Hollywood and several individuals challenge the adopted proposal. They argue that instead of approving Alternative B1b, the FAA should have chosen an alternative that is concededly preferable environmentally, "Alternative C1," consisting of a new runway to the north of the main runway. Besides a variety of other environmental benefits (discussed below), Alternative C1 would spare an area called "Brooks Park"; petitioners describe this as an "old neighborhood park" containing "1.5 acres, with picnic tables, parking, and 'passive open space.'" Pet. Br. at 46-47.

Petitioners invoke two environmental statutes and an executive order: (1) 49 U.S.C. § 47106(c)(1)(B), a part of the AAIA, which conditions FAA approval, when a project such as the county's is shown to have certain adverse environmental impacts, on a finding that there is no "possible and prudent" alternative; (2) § 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 303(c), which somewhat similarly conditions approval of a project that will use a publicly owned park "of national, State, or local significance," plus some other publicly owned amenities, on a finding that there is no "prudent and feasible" alternative; and (3) Executive Order 11,990, § 2(a), 42 Fed. Reg. 26,961 (May 24, 1977), which conditions federal assistance for construction in wetlands on a finding that there is no "practicable alternative."

In its administrative proceedings and before us, the FAA points to airport delays that would continue and even be exacerbated if Alternative C1 were adopted, and to safety hazards associated with that option. It regards these problems as extreme enough, in context, to support its finding that

Alternative C1 was not "prudent" under either statute, nor "practicable" under the Executive Order. It also found Brooks Park not to be a park of local significance.

After addressing the county's arguments that the FAA decision is not final and that petitioners lack standing, we consider whether the FAA either was required to, or did, give the term "prudent" in the AAIA the same meaning that the Supreme Court found "prudent" to have in § 4(f) in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 411-13 (1971); we find that it was free to, and did, give it a somewhat laxer construction. Applying that construction, we find the FAA's decision consistent with the AAIA. We also find that the FAA could reasonably conclude that Brooks Park was not a park protected by § 4(f). Finally, we hold that the agency was not arbitrary or capricious in viewing Alternative C1 as "impracticable" within the meaning of the Executive Order.

*Finality and standing*

Section 46110(a) of Title 49 provides this court jurisdiction to review orders issued by the FAA under the AAIA. Although the FAA does not contest jurisdiction, Broward County has intervened and objected to subject matter jurisdiction on two grounds: lack of finality and lack of standing.

First, the county argues that the FAA's challenged actions under 49 U.S.C. § 47106(c)(1)(B) and Executive Order 11,990 are not final orders, because they merely determine eligibility for federal funds, rather than actually approving a grant of funds. Because the Decision does not award a grant, the county says that the petitioners' objections are premature (with the exception of their § 4(f) claim).

Second, the county objects to the petitioners' standing, saying that a favorable decision in this case would not redress their alleged injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision") (internal quotations omitted). The county contends that it has an approved airport layout plan ("ALP") (approved in the Decision itself, see Decision at 91), and could and would make the proposed changes to the airport even without federal funding and thus, it argues, without the contested rulings under § 47106(c)(1)(B) or Executive Order 11,990. The county is adamant that if federal funding were denied, its intent and ability to proceed with its expansion plans would be just as firm as O'Hare's were shown to be in *Village of Bensenville v. FAA*, 457 F.3d 52, 70 (D.C. Cir. 2006). It says that if the FAA approved the ALP under § 47107(a)(16), the challenged FAA determinations could only be reviewed in a final award of the grant, which the Decision clearly is not. See Decision at 89 (the Decision does "not signify an FAA commitment to provide financial support, which is a separate future decision").

We discuss the two objections to our subject matter jurisdiction—the lack of finality and redressability—in reverse order. The county's understanding of § 47106(c)(1)(B) is mistaken. A number of paragraphs in § 47106 specifically state conditions for approval of "project grant[s]," including paragraphs (a), (b), (e) and (g); but paragraph (c) is in this respect far broader. It governs every application for an airport development project involving the location of an "airport or runway or a major runway extension," regardless of the applicant's interest in federal funding. See *Town of Stratford v. FAA*, 285 F.3d 84, 90-91 (D.C. Cir. 2002).

Assuming the county proceeded without federal funding, its theory would be correct that it and the FAA would have had no need to jump through § 47106(c)(1)(B) hoops, *but only* if its proposed changes to the ALP were minor. Here the county proposes a "major runway extension," defined in FAA regulations as one that "causes a significant adverse environmental impact to any affected environmental resource." FAA Order 5050.4B ¶ 9.l(1). So, even if the county declined federal aid, its airport expansion could proceed only if the FAA approved a new ALP, which it could do only on a finding that the project complied with § 47106(c). Because the county cannot begin the airport expansion without an approved ALP, a determination by this court that the FAA violated § 47016(c)(1)(B) would redress the petitioners' injury by stopping the expansion in its tracks. *Lujan*, 504 U.S. at 561; FAA Order 5050.4B, ¶ 202.c(2) (unconditional ALP approval signals that the FAA has authorized the airport sponsor to begin building the facilities or equipment depicted on the ALP).

For the same reasons, the county's finality objection must fail. The Decision gave its approval to the new ALP, Decision at 91, a necessary condition for implementing Alternative B1b, and a sufficient one so far as FAA approvals are concerned. See *United States v. Los Angeles & S.L.R. Co.*, 273 U.S. 299, 310 (1927) (holding that agency orders are final when they "determine [a] right or obligation"). See also *Environmental Defense Fund, Inc. v. Ruckelshaus*, 439 F.2d 584, 589 & n.8 (D.C. Cir. 1971).

The county also poses finality and standing objections to our reaching petitioners' claims that the FAA violated the Executive Order. So far as we can determine, this challenge depends entirely on the county's claims, set out in its discussion of the AAIA context, that the Decision did not establish any right, and that its reversal would not remedy

Dania Beach's prospective injury, because it was not a final grant of money. But as we have shown, the Decision did afford Broward County a right (the right to proceed with Alternative B1b), and its reversal would correspondingly relieve Dania Beach of the feared injury, namely the side effects of the airport expansion. The same points are equally true as to the FAA's ruling under the Executive Order.

*Merits*

The first issue relating to § 47106(c)(1)(B) is whether "prudent" in that section must have the same meaning as it does in § 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 303(c), as petitioners argue, or whether it is somewhat less demanding here than in that context, as the FAA says. The Supreme Court in *Overton Park* found that § 4(f) allowed use of the protected parks, recreation areas and wildlife resources for transportation projects only when an alternative was rendered imprudent by "truly unusual factors" or problems that rose to "extraordinary magnitudes." 401 U.S. at 413. Petitioners make the seemingly common sense point that a word's meaning should be the same across comparable contexts; after all, both the relevant provisions allow a federal agency to harm a natural resource only if there is no "possible and prudent" or "prudent and feasible" alternative to the proposed project. They also argue that the FAA's internal rules, Order 5050.4B, ¶ 1007.e(4)(b), (5)(a), have assigned the two sections an identical meaning.

Petitioners invoke our decision in *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190 (D.C. Cir. 1991), in support of their argument that the FAA has no discretion to interpret the term "prudent" more narrowly than the Supreme Court's interpretation of § 4(f). But that case does not resolve the point. Having first found that the agency had not violated

§ 4(f), i.e., that it non-arbitrarily found the proposed alternative imprudent under § 4(f), we said that we had "little trouble" deciding that there was no violation of the predecessor of § 47106(c)(1)(B). *Id*. at 205. The proposition that compliance with § 4(f) necessarily entails compliance with § 47106(c)(1)(B) does not, however, mean the reverse— not if § 4(f) restricts the agency more severely than does § 47106(c)(1)(B).

Given the range of plausible interpretations, some deference is due the agency's interpretation under either *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), or *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); here we need not resolve which. The FAA discusses the meaning of "prudent" in both statutes in its Order 5050.4B, an agency "manual" adopted pursuant to a notice-and-comment process as directed by the Vision 100— Century of Aviation Reauthorization Act. Pub. L. 108-176, § 307, 117 Stat. 2490, 2539 (2003). The order, though hardly unequivocal, does not equate the two. Paragraph 1007.e(5)(a) directs FAA officials, in determining whether an alternative is "prudent" for purposes of § 4(f), to "[u]se" seven listed factors, such as whether the park-preserving alternative would cause "extraordinary safety or operational problems." Paragraph 1007.e(4)(b) addresses "prudent" in the context of § 47106(c)(1)(B); it in turn refers to the ¶ 1007.e(5)(a) factors, but does so, we think, more vaguely and with somewhat less insistence, saying that e(5)(a) defines prudent "relative to Section 4(f)" but is still "very useful" for application of § 47106(c)(1)(B). (Both sections say that "'prudent' refers to rationale [sic] judgment"; neither counsel relied on that language or could offer any interpretive help.)

In its brief before us the FAA explicitly offers an interpretation of § 47106(c)(1)(B) and Order 5050.4B distinctly laxer than that of *Overton Park*'s reading of § 4(f);

it argues that it may find an option imprudent if it "is significantly inferior at serving the FAA's statutory mandates under the AAIA, including the mandates to increase capacity, accommodate demand with less delay, and ensure safety." Resp. Br. at 23. As an interpretation of the FAA's *regulation*, such an interpretation is entitled to deference so long as it reflects "the agency's fair and considered judgment on the matter in question," not just its litigating position. *Auer v. Robbins*, 519 U.S. 452, 462-63 (1997). Here, the brief's interpretation is not new: the FAA elaborated a very similar interpretation in its legal brief submitted in May 2007 in its Brief for Respondent at 27-28, 31-34, *Natural Resources Defense Council v. FAA*, 564 F.3d 549 (2d Cir. 2009) (No. 06-526) ("*NRDC v. FAA*"). The *NRDC* court substantially accepted this interpretation. See *NRDC v. FAA*, 564 F.3d at 565-67.[1]

Despite the two statutes' general similarity in context, the FAA reasons that the greater breadth of resources protected by § 47106(c)(1)(B) cuts against an idea of "prudent" identical to that of § 4(f). The latter applies only to parks, recreation areas, and wildlife or waterfowl refuges that have been declared significant; § 47106(c)(1)(B) protects "natural resources, including fish and wildlife, natural, scenic, and recreation assets, water and air quality, or another factor affecting the environment." Section 4(f) prohibits "use" while § 47106(c)(1)(B) bans "significant adverse effect[s]."

In addition, the *NRDC* court observed that § 4(f) protects only publicly owned resources, so their use will almost always be less costly to "the public purse," *id*. at 566 (citing *Overton*

---

[1] The court speaks of the FAA's AAIA definition of "prudent" as "broader," 564 F.3d at 567, but given the various negatives it is surely narrower, with the implied "imprudent" being broader.

*Park*, 401 U.S. at 412); and because no one normally lives or works in § 4(f)-protected areas, no one will have to be driven from his home or business, *id*. Thus the § 4(f) context requires exceptional agency push-back if the resources are to have any chance. By contrast, *NRDC v. FAA* reasoned, the AAIA protected privately owned as well as public lands, so that an alternative affecting the protected resources was less likely to have an automatic advantage.

Besides the difference in range of protected resources and *NRDC v. FAA*'s arguments, § 47106(c)(1)(B) is part of a larger statute, the AAIA, which boosts airport development unusually aggressively. See 49 U.S.C. § 47101(a)(7) ("airport construction and improvement projects that increase the capacity of facilities to accommodate passenger and cargo traffic [should] be undertaken to the maximum feasible extent so that safety and efficiency increase and delays decrease").

This case falls somewhere between the conditions for deference to agency interpretations of their regulations under *Auer* and the restricted conditions for deference to interpretations of an enabling statute under *Mead*. *United States v. Mead Corp.*, 533 U.S. 218 (2001). If Order 5050.4B simply echoed the exact language of § 47106(c)(1)(B), the agency's brief could enjoy no *Auer* deference. *Gonzales v. Oregon*, 546 U.S. 243, 256-57 (2006). But given Order 5050.4B's suggestion of a gap between the statutes' meanings, the FAA briefs' apparently consistent articulation of such a difference, and the evident differences in the two provisions' scope and purpose, we find the interpretation offered here by the FAA within its discretion.

Quite apart from questions of *degree* of prudence or imprudence, the FAA invokes Order 5050.4B, ¶ 1007.e(4)(b) for the principle that under § 47106(c)(1)(B) it may consider not only how well each alternative meets the project's purpose

and need, the FAA's statutory mandates under the AAIA, and the county's goals, but also the competing proposals' varying levels of environmental harm. As it points out, all the alternatives it considered would have *some* significant adverse effects on natural resources. While Alternative C1 was the "environmentally preferred alternative," it would nevertheless cause noise impacts to 285 households, could result in destruction of 15.40 acres of wetlands in order to relocate displaced airport tenants, and may affect a federally-listed species—compared with noise impacts to 1051 households and destruction of 15.41 acres of wetlands under Alternative B1b. Decision at Tbl.3. To be sure, § 47106(c)(1)(B) does not allow the FAA to engage in an open-ended, fully discretionary balancing of competing interests. But we think that where protected resources are on *both* sides of the balance, the FAA may properly consider not only the non-environmental defects of the environmentally preferred option, but also the margin by which its environmental advantages exceed those of the alternative.

With these principles in mind, we have little difficulty finding that there was nothing arbitrary or capricious in the FAA's finding that Alternative C1 was not "prudent," and that § 47106(c)(1)(B)'s demands were satisfied. The FAA found that although the selected Alternative B1b would have more adverse environmental impacts than Alternative C1, it would have a radical edge in meeting the transportation purposes of reducing delays, ensuring safety and increasing capacity. See *Id.* at 46-48. The delay differences alone are striking. Alternative B1b would have 3.1 minutes of average delay per operation and would perform almost as well in poor-weather conditions: 3.2 average minutes of delay in East Flow operations and 8.3 average minutes of delay in West Flow operations. *Id*. at 46 & n.96. By contrast, Alternative C1 would have average delays of 5.0 minutes of per operation, skyrocketing in poor-weather conditions to 32.2 minutes in

East Flow operations and 79.1 minutes in West Flow ones. *Id*.

Petitioners try to parry the delay figures with the point that poor-weather delays are rare (occurring only 7% of the time). They also argue that § 47106(c)(1)(B) requires the FAA to select the environmentally-preferred alternative so long as it meets the project's pre-defined purpose and need, which had been set as six minutes of average delay per operation, even if it meets that criterion only minimally.

But projections prepared in the final EIS showed that Alternative C1 would perform as poorly as the no action alternative in poor weather conditions (and worse than Alternative B1b by a factor of 10). Final Environmental Impact Statement for the Development and Expansion of Runway 9R/27L and Other Associated Airport Projects at Fort Lauderdale-Hollywood International Airport (June 2008), App. F at F-19. And the 7% frequency of poor weather amounts to an average of 25 days a year. We think the FAA entirely within its discretion in placing weight on defects in Alternative C1 that were not foreseen in the original formulation of goals.

The different alternatives also vary considerably in their fit with the existing airport layout, with the edge decisively in favor of Alternative B1b. Under it, both the main runway and the extended south runway could operate independently, reducing complexity in coordinating arrivals and departures. Decision at 46-47. Under Alternative C1, no such independent operation would be possible for the main runway and the proposed new one. Instead, air traffic control would have to take extra precautions in coordinating takeoffs and landings. *Id*. And under Alternative C1, once airplanes were on the ground they could access the terminal from either runway only by crossing an active runway. *Id*. at 46.

The petitioners respond that this is nothing extraordinary, and that air traffic control could easily coordinate air traffic and runway crossings. But the fact that air traffic control could choreograph the dance of the airplanes does not suggest that such coordination is not more cumbersome or less safe than the alternative. Human error is the most common cause of aviation accidents. See SCOTT SHAPPELL ET AL., DOT/FAA/AM-06/18, HUMAN ERROR AND COMMERCIAL AVIATION ACCIDENTS: A COMPREHENSIVE, FINE-GRAINED ANALYSIS USING HFACS, at 1 (2006) (reporting that "60-80% of aviation accidents are due, at least in part, to human error"). The FAA can reasonably determine that concerns about safety combined with substantially greater delays would render Alternative C1 imprudent under § 47106(c)(1)(B). See *NRDC v. FAA*, 564 F.3d at 568 ("[t]he AAIA entrusts the agency with the responsibility for assessing prudence by deciding for itself the appropriate weight to accord myriad relevant factors"); Order 5050.4B, ¶ 1007.e(5)(a) (suggesting that accumulation of adverse factors collectively can render an alternative imprudent).

In sum, we find that the FAA was not in violation of law in its construction of "prudent" for the purposes of § 47106(c)(1)(B), nor was it arbitrary or capricious in finding that the use of Alternative C1 would not have been prudent.

Petitioners' "Brooks Park" argument has two elements: first, a substantive claim that the area qualified for § 4(f) protection as a "public park . . . of . . . local significance"; second, a motion to supplement the administrative record with draft environmental impact statements ("EISs") prepared in 2001 and 2002 evaluating a different (albeit similar) proposal to expand the airport, and with documents submitted during those processes. If admitted, they argue, these would reinforce its argument that the FAA's determination that the area was not a park was arbitrary and capricious.

The record before the FAA indicated that the primary public function of the space in question, lying between the airport fence and a perimeter road on the east side of the airport, was for airplane-viewing, though with some later encroachment by commercial vehicles using it as a waiting area. Joint Appendix ("J.A.") 114-15. There is no claim that the area featured the sort of "natural beauty" that is among the values § 4(f) seeks to protect. See 49 U.S.C. § 303(a). Invoking the section's references to "historical sites," however, petitioners suggest that the area was an "old neighborhood park" that "existed for many years," that Dania Beach's 1994 comprehensive plan included a reference to it, J.A. 20, and that it dates back to "a time when the Airport was much smaller." Pet. Br. at 46-47. As a result, they argue, its significance must be presumed. Pet. Reply Br. at 24 (citing to 23 C.F.R. § 774.11(c)).

None of this seems to undermine the FAA's refusal to regard this plane-viewing site as a public park of local significance. Petitioners reinforce their claim, however, by invoking an FAA handbook provision against manipulative redesignations of sites:

> Where the use of a property is changed . . . from a section 4(f) type use to a transportation use in anticipation of a request for FAA approval, section 4(f) shall be considered to apply.

Order 1050.1E, App. A, ¶ 6.2d. They argue that the county, after it bought the area from Dania Beach in 1997, changed its formal "use" from park to transportation. Under the handbook, they say, it follows that § 4(f) must be "considered to apply."

The petitioners are deeply overreading Order 1050.1E, App. A, ¶ 6.2d. The fact that the designated use of the area

was changed from park to transportation does not convert a non-§ 4(f) resource into a § 4(f) resource. The evidence in the record supports the FAA's conclusion that the land was never a § 4(f) resource. The county as its owner never considered the land to be a park. J.A. 114. In fact, it has said that the land was used "illegally by commercial vehicles . . . as a waiting area" (a use that prevented use of the picnic tables). *Id.* Apart from their assertion, petitioners introduced no evidence that the area had been used as a park—unless the FAA was obliged to regard *any* airplane-watching site with picnic tables as a "park of local significance." See also *Stewart Park & Reserve Coalition, Inc. v. Slater*, 352 F.3d 545, 557 (2d Cir. 2003) (holding that "uninterrupted and purposeful use by the public" makes particular lands a public park and recreation area within the meaning of § 4(f)). It was not arbitrary or capricious for the FAA to conclude that § 4(f) did not apply to this tract.

The petitioners have moved before us to supplement the administrative record with hundreds of pages of documents introduced in prior EIS processes that contemplated the airport expansion. We deny their motion. As we explained in *Texas Rural Legal Aid v. Legal Services Corp.*, we do not allow parties to supplement the record "unless they can demonstrate unusual circumstances justifying a departure from this general rule." 940 F.2d 685, 698 (D.C. Cir. 1991). In *American Wildlands v. Kempthorne*, 530 F.3d 991 (D.C. Cir. 2008), we held that the record can be supplemented in three instances: (1) if the agency "deliberately or negligently excluded documents that may have been adverse to its decision," (2) if background information was needed "to determine whether the agency considered all the relevant factors," or (3) if the "agency failed to explain administrative action so as to frustrate judicial review," *id.* at 1002. None of these conditions is met here.

The FAA has been considering the expansion of the airport since 1996. 61 Fed. Reg. 14,190 (Mar. 29, 1996). In 2001 and 2002, the FAA issued a draft EIS and two supplemental draft EISs analyzing that proposal. In 2005, the county substantially revised the proposed expansion, and the FAA began the process anew, including holding new public hearings and preparing a completely new EIS. 70 Fed. Reg. 3095 (Jan. 19, 2005). The petitioners contend that the administrative record nevertheless must include documents produced since the FAA first began considering the airport's expansion. They claim that the FAA selectively excluded adverse documents from the earlier administrative process. Those documents would show that the FAA once considered Brooks Park to be a § 4(f) resource (they are also said to show that the alleged problems with Alternative C1 were exaggerated).

Instead of identifying particular documents adverse to the FAA, the petitioners have simply submitted the entirety of the three draft EIS statements prepared in 2001 and 2002 during the prior EIS processes. But this vague proffer hardly supplies the requisite "unusual circumstances" to justify an order supplementing the record with 1500 pages of additional material. *Texas Rural Legal Aid*, 940 F.2d at 698. Petitioners' positions about Brooks Park and Alternative C1 have by no means been scanted, and they make no claim that they were denied a chance to press those positions. In fact, they submitted a number of comments and objections regarding Brooks Park during the process and the FAA properly considered them. See Decision, App. A at A.9-1. As regards problems with Alternative C1, the court is satisfied that FAA's treatment in the Decision under review was complete and thorough. Petitioners' claim that the supplementary documents would manifest FAA exaggeration of the problems with Alternative C1 is too generalized to

support such a massive inflation of the record. Accordingly, we deny the motion to supplement the record.

Petitioners' final argument invokes Executive Order 11,990, § 2(a), 42 Fed. Reg. 26,961 (May 24, 1977), which conditions federal assistance for construction in wetlands on a finding that there is no "practicable alternative"; in resolving that issue, the agency is to consider "economic, environmental and other pertinent factors." *Id*. Alternative B1b would destroy 15.41 acres of wetlands, the FAA found, of which 3.05 acres are mangrove wetlands. Alternative C1 would destroy 15.40 acres of wetlands, but the FAA believed the impacts could be reduced with further planning. Decision at 28, 47 & n.97.

The Ninth Circuit has found that the standard under Executive Order 11,990 is "less prohibitive and contemplates more balancing of other factors" than § 4(f). *Nat'l Wildlife Federation v. Adams*, 629 F.2d 587, 591 (9th Cir. 1980). For reasons similar to those behind our decision about § 47106(c)(1)(B)—the greater breadth of the resources protected, the section's application regardless of private or public ownership, and the ubiquity of application—we find that conclusion persuasive.

Even assuming for the purposes of argument that Alternative C1 would cause no impacts to wetlands, the FAA's determination was not arbitrary and capricious. As we discussed above, Alternative C1's inferiority to Alternative B1b, in its longer delays (particularly in poor weather) and the safety drawbacks of the requisite runway-crossing, render it not only imprudent under § 47106(c)(1)(B) but impracticable under the Executive Order.

18

* * *

The motion to supplement the record and the petition for review are accordingly

*Denied.*

ROGERS, *Circuit Judge, concurring in part, dissenting in part, and concurring in judgment*: I write separately on the question whether the court may properly defer to the Federal Aviation Administration's position on appeal that the word "prudent" has different meanings in section 4(f) of the Department of Transportation Act of 1966 ("DOT Act") and section 509(b)(5) of the Airport and Airway Improvement Act of 1982 ("AAIA," codified at 49 U.S.C. § 47106(c)(1)(B)). The analysis adopted by the majority in deferring to a *post hoc* litigating position takes a strange turn and is flawed. In section 4(f), Congress used the word "prudent" in an environmental context involving transportation projects. The Supreme Court construed the word in *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971). Thereafter Congress used the same word in the AAIA in a broader environmental context involving transportation projects. The FAA formally announced in Order 5050.4B that it interpreted "prudent" in the two statutes to mean the same thing, and this court previously understood the two statutes the same way. Nonetheless, the majority concludes that because the AAIA protects more of the environment than section 4(f), there was a "gap" between the statutes affording the FAA "discretion," Maj. Op. at 10, to adopt an interpretation of "prudent" that is "distinctly laxer," Maj. Op. at 8, than the Supreme Court's even though this interpretation can be found only in the FAA's appellate brief, Maj. Op. at 9. Precisely why a *post hoc* statement of counsel for the FAA is entitled to deference the majority does not say other than to note that counsel's *post-hoc* statement is "not new." Maj. Op. at 9. The majority also draws on a distinction between public and private property that another court adopted in a case where facts belied the validity of the distinction.

It is unnecessary in concurring in the judgment to decide whether the FAA's Order 5050.4B is consistent with the Supreme Court's analysis of the word "prudent" in section 4(f).

Suffice it to say, because the record demonstrates that the FAA acted consistently with its regulatory interpretation of "prudent" in Order 5050.4B in determining whether Alternative C1, favored by petitioners, met the transportation goals of the Fort Lauderdale-Hollywood International Airport expansion, the FAA's determination that Alternative C1 is imprudent was not arbitrary or capricious or contrary to law. *See* FED. AVIATION ADMIN., RECORD OF DECISION, THE DEVELOPMENT AND EXPANSION OF RUNWAY 9R/27L AND OTHER ASSOCIATED AIRPORT PROJECTS AT FORT LAUDERDALE-HOLLYWOOD INTERNATIONAL AIRPORT, BROWARD COUNTY, FLORIDA 32-33 (2008) ("RECORD OF DECISION"). Accordingly, except as discussed below, I concur.

## I.

Section 4(f) of the DOT Act of 1966 provides that the Secretary of Transportation may approve a transportation program or project

> requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance . . . only if--
>
> > (1) there is no *prudent* and feasible alternative to using that land; and
> >
> > (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.

49 U.S.C. § 303(c) (emphasis added).

In *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S.

402 (1971), the Supreme Court addressed the meaning of "prudent" in section 4(f). It held that to be imprudent and thereby justify the destruction of parkland, the alternative to using a section 4(f)-protected resource must present "unique" and "truly unusual" problems reaching "extraordinary magnitudes." 401 U.S. at 413.

In 1982, Congress enacted the AAIA, Pub. L. No. 97-248, 96 Stat. 324, 684 (1982). Section 509(b)(5) of the AAIA, now codified at 49 U.S.C. § 47106(c)(1)(B), provides that the Secretary of Transportation may authorize a major airport development project that

> is found to have a significant adverse effect on natural resources, including fish and wildlife, natural, scenic, and recreation assets, water and air quality, or another factor affecting the environment, only after finding [1] that no possible and *prudent* alternative to the project exists and [2] that every reasonable step has been taken to minimize the adverse effect.

49 U.S.C. § 47106(c)(1)(B) (emphasis added). A recodification in 1994, *see* Pub. L. No. 103-272, 108 Stat. 745, 1255, changed the original "feasible and prudent" to the current "possible and prudent," 49 U.S.C. § 47106(c)(1)(B), but "no substantive change in the law" was intended, H.R. REP. NO. 103-180, at 5 (1993), *reprinted in* 1994 U.S.C.C.A.N. 818; *see* S. REP. NO. 103-265, at 3 (1994).

The Supreme Court has long considered Congress to intend similar or identical language to have the same meaning in two different statutes when "the two provisions share a common raison d'etre." *Northcross v. Bd. of Educ. of Memphis City Sch.*, 412 U.S. 427, 428 (1973) (quoting *Johnson v. Combs*, 471 F.2d 84, 86 (5th Cir. 1972)). Thus, as the Supreme Court held in

*Smith v. City of Jackson, Miss.*, 544 U.S. 228 (2005), "when Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes." 544 U.S. at 233 (citing *Northcross*); *see Nat'l Treasury Emps. Union v. Chertoff*, 452 F.3d 839, 857 (D.C. Cir. 2006) (citing *Smith*). Further, "when 'judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its . . . judicial interpretations as well.'" *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) (quoting *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998)) (modification in original).

Applying the presumption, it is clear Congress intended "prudent" in section 47106(c)(1)(B) (the AAIA) to mean the same thing as in section 4(f) and as construed by the Supreme Court in *Overton Park*. Contextually, the term is used identically in the two statutes: both provisions limit the Secretary of Transportation's power to approve new transportation projects when they would "use" (as in section 4(f)) or "cause significant adverse effects" (as in section 47106(c)(1)(B)) to the protected environmental resources. In the years between enactment of section 4(f) and the AAIA's enactment, the Supreme Court defined "prudent" as used in section 4(f) in *Overton Park*. It is difficult to imagine that Congress did not have in mind this settled understanding of the meaning of "prudent" when it chose to employ the same word (and the same concomitant requirement, feasibility) in a virtually identical context for the same purpose of protecting environmental resources. Congress gave no indication in the AAIA that it intended a different meaning, which it easily could have done, much less that it intended to water down the high hurdle that the Supreme Court identified in *Overton Park*.

The FAA, which, as relevant here, has been delegated authority for carrying out section 4(f) and section 47106(c)(1)(B), reached the same conclusion in formally adopting the interpretation that the word "prudent" has the same meaning in both statutes.  In Order 5050.4B, the FAA's regulatory announcement of internal policies published upon congressional direction for notice and comment in the Federal Register, *see* Maj. Op. at 8, the FAA stated that "prudent" as used in the AAIA is "defined relative to section 4(f)."  Order 5050.4B, ¶ 1007.e(4)(b) (Apr. 26, 2006), *available at* http://www.faa.gov/airports/resources/publications/orders/envi ronmental_5050_4/; *see Notice of Publication of the Preamble to Order 5050.4B*, 71 Fed. Reg. 29,014 (May 18, 2006) ("*2006 Notice*"); *Notice of Availability and Request for Comments on Draft Order 5050.4B*, 69 Fed. Reg. 75,374 (Dec. 16, 2004).  The "ordinary or natural meaning," *Bailey v. United States*, 516 U.S. 137, 145 (1995) (internal quotation marks omitted), of the noun "relative" is "a thing having a relation to or connection with or necessary dependence on another thing," MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 987 (10th ed. 1993) ("MERRIAM"). Order 5050.4B cross-references its own paragraph 1007.e(5)(a) for "more information" about the meaning of "prudent" in section 47106(c)(1)(B), and that paragraph lists seven factors for the FAA to weigh in considering "[a]irport actions resulting in use of section 4(f)-protected resources."  The preamble to Order 5050.4B states, moreover, that the "FAA . . . believes [this definition of "prudent"] is appropriate for FAA actions under 49 U.S.C. § 47106(c)(1)(B) as well as Section 4(f)." *2006 Notice*, 71 Fed. Reg. at 29,019.  Viewed contextually, the "necessary dependence" meaning of the word "relative" applies.

Ordinarily, were deference due to the FAA's interpretation, whether under *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837 (1984), or *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), *see* Maj. Op. at 8, the FAA has already spoken by

regulation on the precise question in a manner consistent with the presumption that Congress used the word "prudent" to mean the same thing in the AAIA and section 4(f), as interpreted by the Supreme Court in *Overton Park*. *See Auer v. Robbins,* 519 U.S. 452, 461 (1997). Before this court, although not contesting that the FAA is bound by its interpretation in Order 5050.4B, *see United States v. Mead Corp.*, 533 U.S. 218 (2001), counsel representing the FAA states that FAA Order 5050.4B provides that the definition of "prudent" in section 4(f) is "useful" to defining the term in section 47106(c)(1)(B) but "does not suggest that 'prudent' has the same meaning under both statutes." Respd.'s Br. 42. This means, counsel tells the court, that additional factors may be considered in the section 47106(c)(1)(B) "prudent" analysis that may not be considered in the section 4(f) analysis. *See id.* at 42-44. Counsel further maintains that this litigating interpretation merits deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). *See* Respd.'s Br. 42. Yet the Order, in fact, uses the phrase "*very* useful"(emphasis added) and in the context of the surrounding language, and considering also the unequivocal statement in the preamble, the phrase "very useful" in Order 5050.4B simply explains that the definition contained in paragraph 1007.e(5)(a) applies to section 47106(c)(1)(B) notwithstanding that paragraph's references to section 4(f). Nothing in the "very useful" phrase indicates that the meaning of "prudent" differs under the two statutes, and the FAA has not identified a separate list of factors for consideration under the AAIA. Under the circumstances, unlike in *Aue*r, 519 U.S. at 462, there is "reason to suspect" FAA's *post hoc* litigating position does not reflect the agency's "fair and considered judgment on the matter in question" and no deference is due to that position, even if, as the majority states, Maj. Op. at 9, counsel has taken the same position in another case while Order 5050.4B remains unchanged. S*ee Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983).

In construing "prudent" to have the same meaning in both statutes, the FAA's interpretation is also consistent with our precedent.  In *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190 (D.C. Cir. 1991), the court addressed a challenge to a proposed airport expansion under both section 4(f) and the original version of what is now section 47106(c)(1)(B).   In holding that the FAA violated neither statute when it rejected the proposed alternative as imprudent, the court observed that some of the AAIA "parrots" (i.e., "repeat[s] by rote," MERRIAM at 846) some of section 4(f), specifically, the latter statute's "feasible and prudent" requirement.   938 F.2d at 205. Responding to the petitioners' theory that anytime the FAA violates section 4(f)(1) it automatically violates the AAIA, the court stated that "[a]n agency that fails to choose a 'prudent and feasible alternative'" under the AAIA "obviously fails at the same time to choose a 'feasible and prudent alternative'" under section 4(f).  *Id.*  Although the court had no occasion to hold that an imprudent alternative under the AAIA is necessarily also imprudent under section 4(f), *see* Maj. Op. at 7-8, there is nothing in the opinion to suggest that the word should be read differently in the two statutes and everything to suggest that the court understood the meaning of "prudent" in each to be the same.  *See* 938 F.2d at 205.  The petitioners there argued that any time the FAA violates section 4(f),  it also violates the AAIA. *See id.*  The court stated "we agree in principle with this aspect of [petitioner's] theory," and went on to hold that "we have little trouble deciding under [the AAIA] that while [the rejected alternative] may have been a feasible alternative to [the alternative chosen by the FAA], it was also an imprudent one." *Id*.

Nonetheless, the majority concludes that petitioners' "seemingly common sense point that a word's meaning should be the same across comparable contexts," Maj. Op. at 7, much less the FAA's regulatory interpretation in Order 5050.4B,  must

yield to FAA counsel's "distinctly laxer," Maj. Op. at 8, interpretation of the meaning of the word "prudent" in the AAIA because of some contextual differences between section 47106(c)(1)(B) and section 4(f). Those differences, according to the majority, include that section 4(f) protects a narrower set of resources and prohibits "use" rather than "significant adverse effect[s]." Maj. Op. at 8; *see* Respd.'s Br. 44. These differences, which are not mentioned by the FAA in either the Record of Decision or Order 5050.4B, merely define the precise contours of each statute's application; they do not suggest that the contexts are so dissimilar that the ordinary presumption does not apply. After all, two statutes need not be so similar as to be redundant in order for Congress to have intended identical terms to be read identically. In *Smith v. City of Jackson, Miss.*, 544 U.S. 228, the Supreme Court held that Congress meant in the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"), to create a cause of action for disparate impact because the language prohibiting discriminatory conduct tracked the language of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* 544 U.S. at 233. The Court reached this conclusion although the ADEA prohibits age discrimination while Title VII prohibits discrimination on the basis of race, color, religion, sex, or national origin, and thus, the objects of those statutes do not overlap at all. In contrast, section 4(f) and section 47106(c)(1)(B) have considerable overlap, as many of the resources protected by section 4(f) are also protected by section 47106(c)(1)(B), and an airport expansion under the AAIA is, by definition, a transportation project under section 4(f). Additionally, the Supreme Court in *Smith* applied the presumption that the statutes' "parallel" language had the same meaning even though the ADEA "contains [additional] language that significantly narrows its coverage" relative to Title VII. 544 U.S. at 233. The same analysis is reflected in Order 5050.4B's conclusion as stated in its preamble, but the majority ignores it.

The majority (and counsel for the FAA) also relies on *NRDC v. FAA*, 564 F.3d 549 (2d Cir. 2009), which suggested that "prudent" should be read differently in the two statutes because section 4(f) safeguards only publicly owned lands, which require more protection than the public *or* private natural resources protected by section 47106(c)(1)(B). Maj. Op. at 9-10. There are several reasons to be wary of following the analysis in *NRDC v. FAA*. To begin with, the distinction drawn in *NRDC v. FAA* between the public lands covered by section 4(f) and the public and private lands covered by the AAIA is unpersuasive. There the court suggested that greater scrutiny is required of proposed appropriations of public lands because economic considerations and private interests will often support the use of public over private lands whenever possible. 564 F.3d at 566. Perhaps so, but this public/private distinction cannot be divined from *Overton Park* and it is belied by the facts in *NRDC v. FAA* itself, which involved privately owned wetlands that the owner/developer, anticipating the economic boom that would accompany airport expansion, offered to donate for airport construction purposes. Moreover, in *NRDC v. FAA*, the court referred to "broader" when it meant "narrower," *see* Maj. Op. at 9 n.1; it incorrectly stated that section 4(f) applies only to highway projects and not to airport expansions, *id.* at 566; and it never addressed the text of Order 5050.4B, much less its preamble stating that the FAA concluded the word "prudent" should be construed the same way in the airport expansion context.

Even assuming Congress sought through enacting the AAIA to "boost[] airport development unusually aggressively," Maj. Op. at 10, Congress imported into the statute a limitation on the authority of the Secretary of Transportation that was well known and judicially understood in the context of the environmental impacts of transportation projects. To conclude on the basis of the overarching statutory purpose that a limitation to the

effectuation of that purpose should be read narrowly, *see id.*, assumes the conclusion about the meaning of "prudent" in the AAIA. Moreover, notwithstanding the majority's conclusion about the AAIA's broad purpose, Congress also provided in the statute that another of its objectives is that "airport development projects authorized pursuant to this title shall provide for the protection and enhancement of the natural resources and the quality of the environment of the Nation." AAIA, Pub. L. No. 97-248 § 509(b)(5), 96 Stat. 324, 684 (1982). Nearly identical language immediately precedes section 4(f) in the DOT Act. *See* 49 U.S.C. § 303(a).

For these reasons, the majority's effort to identify a statutory gap that may be filled by the "not new" *post hoc* position of counsel for the FAA is flawed and there is no basis for deferring to counsel's "laxer" interpretation. Whatever ambiguity the word "prudent" may have has been resolved by the FAA's Order 5050.4B, which reflects a reading that the word in section 47106(c)(1)(B) as it is defined in section 4(f) and *Overton Park* is most consistent with the statutes' shared objectives.

## II.

As this court has observed, "the case law uniformly holds that an alternative is imprudent under section 4(f)(1) if it does not meet the *transportation* needs of a project." *Citizens Against Burlington*, 938 F.2d at 203 (emphasis in original) (citing cases). The FAA "examined in detail the relative flaws" of Alternative C1 in terms of meeting the goals of the proposal under review, to expand the Fort-Lauderdale-Hollywood International Airport in order to reduce delays and expand capacity. *Id.* at 204. Therefore, consistent with the FAA's conclusion that "prudent" is to be read the same way in the AAIA and in section 4(f), *see* Order 5050.4B, ¶ 1007.e(4)(b), the FAA was not arbitrary and capricious in deeming Alternative C1 favored by petitioners to

be imprudent due to its failure to meet operational and safety needs of the project. Petitioners' objections are unpersuasive for the reasons stated by the majority. *See* Maj. Op. at 12-13.

With regard to their contention that Brooks Park is a section 4(f) resource, petitioners introduced no evidence in this proceeding that the area had been used as a qualifying park, "unless the FAA was obliged to regard *any* airplane-watching site with picnic tables as a 'park of local significance,'" Maj. Op. at 15, which they do not claim. Rather, petitioners assert that the area was a neighborhood park for many years, *see* Petrs.' Br. 46-47, which, in the face of a bare administrative record, is insufficient, *see, e.g., Stewart Park & Reserve Coal., Inc. v. Slater*, 352 F.3d 545, 557 (2d Cir. 2003). Their efforts to supplement the record in this court with documents from separate, prior environmental impact assessments related to an earlier airport expansion proposal fail for the reasons stated by the majority. *See* Maj. Op. at 16-17. Hence, as petitioners failed to show that Brooks Park was *ever* used as a section 4(f) resource, the court has no occasion to address petitioners' objection that Broward County's purchase and rezoning of Brooks Park was the type of end-around that FAA Order 1050.1E, which provides that section 4(f) "shall be considered to apply" in circumstances "[w]here the use of a property is changed . . . from a section 4(f) type use to a transportation use in anticipation of a request for FAA approval," is designed to prevent. Order 1050.1E, App'x A, ¶ 6.2d; *see* RECORD OF DECISION at A.9-1; INTERLOCAL AGREEMENT BETWEEN BROWARD COUNTY AND CITY OF DANIA PERTAINING TO EXPANSION OF JURISDICTION OF THE FORT LAUDERDALE-HOLLYWOOD INTERNATIONAL AIRPORT 2-3 (1995).

Accordingly, I dissent in part, concur in part, and concur in the judgment.